Helen H. PAVLIDIS, et al.,
Plaintiffs, Appellants,

v.

NEW ENGLAND PATRIOTS FOOTBALL CLUB, INC., et al., Defendants, Appellees.

No. 83–1637.

United States Court of Appeals,
First Circuit.

Argued March 9, 1984.

Decided June 22, 1984.

Rehearing Denied June 22, 1984.

Anthony Tarricone, Boston, Mass., with whom Camille F. Sarrouf, Sarrouf, Tarricone & Flemming, Boston, Mass., and Nathaniel S. Weiner, Norwood, Mass., were on brief, for plaintiffs, appellants.

James H. Carter, Jr., New York City, with whom Howard D. Burnett, Sullivan & Cromwell, New York City, George T. Finnegan, John D. Donovan, and Ropes & Gray, Boston, Mass., were on brief, for New England Patriots Football Club, Inc.

Richard E. Bachman, Boston, Mass., with whom Hale, Sanderson, Byrnes & Morton, Boston, Mass., were on brief, for William H. Sullivan, Jr., and Mary H. Sullivan.

Before COFFIN, BOWNES and BREYER, Circuit Judges.

COFFIN, Circuit Judge.

This suit arises out of a securities transaction in which William H. Sullivan, Jr., gained control of the New England Patriots Football Club (Patriots) by forming a separate corporation (New Patriots) and merging it with the old corporation. Plaintiffs are a class of stockholders who voted to accept the New Patriots' offer of $15.00 per share for their common stock in the Patriots corporation. They now claim that they were induced to accept this offer by a misleading proxy statement drafted under the direction of Mr. Sullivan, who owned a controlling share in the voting stock of Patriots at the time of the merger. The proxy statement, plaintiffs claim, contained various misrepresentations designed to paint a gloomy picture of the financial position and prospects of Patriots, so that the shareholders undervalued their stock.

They seek to rescind the merger or to receive a higher price per share for the stock they sold. The district court entered a judgment in favor of defendants after a bench trial. We affirm in part, vacate in part, and remand.

## I. Facts

Defendant Sullivan and nine others organized Patriots in 1960 with 100,000 shares of voting common stock issued to the ten promoters at a price of $2.50 per share and with 120,000 shares of non-voting common stock issued to the public at a price of $5.00 per share. The voting stock was privately held; the non-voting stock was traded publicly in the over-the-counter market. In 1975, Sullivan, who owned 23,-718 shares of the voting stock, gained control of the corporation by buying the remaining voting shares at prices in excess of $100 per share. He borrowed approximately $5,348,000 from several banks to finance this purchase. When he had completed his purchase of the voting shares, Sullivan gave Patriots a new board of directors that included himself, his son, and his cousin Mary H. Sullivan as members. He then created New Patriots, a separate corporation with the same board of directors.

On November 5, 1976, Patriots issued a proxy statement calling for a special meeting to vote on the proposed merger of Patriots with New Patriots. The proxy statement disclosed that New Patriots offered a price of $15.00 per share for the non-voting stock, whose bid price had reached a high of $9.50 per share in the months before the merger was announced. In addition, the proxy statement contained sixty pages of information on the financial status of the corporation, the reasons for the merger, the interest of William Sullivan in the merger, and other matters pertinent to the shareholders' decision whether or not to vote in favor of the merger.

Patriots held the special meeting on December 8, 1976. At this time, Mass.Gen.

Laws Ann. ch. 156B, § 78(c), required that a merger be approved by a majority vote of each class of shareholders, including those who held shares designated "non-voting" for ordinary purposes.[1] The holders of non-voting common stock in Patriots voted 82,474 shares, or approximately 59%, in favor of the merger. All shareholders except those who had perfected their appraisal rights under Mass.Gen.Laws Ann. ch. 156B, §§ 86 & 89, were required to surrender their shares for the offered price of $15.00 per share. Those shareholders who had perfected their appraisal rights by objecting to the merger and filing a written demand for payment are now awaiting a determination by the Norfolk Superior Court of the fair value of their shares.

A number of the shareholders who had voted in favor of the merger subsequently concluded that the proxy statement had been materially false and misleading. They brought suit in the United States District Court for the District of Massachusetts, claiming that the proxy statement violated the federal securities laws and various provisions of state law. The district court found that the proxy statement was "an artful attempt to minimize the future profitability of the Patriots and to put a wash of corporate respectability over Sullivan's diversion of the corporation's income for his own use", and that it represented "the deliberate design of Sullivan and the Patriots' attorneys [to be misleading] in the face of requests from counsel for the banks ... that the Proxy Statement be more boldly forthright". Nevertheless, the court found that "the reader who followed through the whole document was given sufficient information to form his own judgment" about the Patriots' prospects, and it entered a judgment for defendants on all counts.

## II. Standard of Review

Appellants argue that the district court "applied an improper concept of materiality

---

1. An amendment to Mass.Gen.Laws Ann. ch. 156B, § 78(c), effective November 26, 1976, had changed the required vote from two thirds of each class to a majority of each class. The two-thirds requirement was restored by a subsequent amendment in 1981.

to the omissions and misleading statements" in the proxy statement. They suggest that the standard of materiality should be less stringent in cases involving insiders. *See Cook v. Avien, Inc.*, 573 F.2d 685, 694 n. 19 (1st Cir.1978) (observing that "[t]he securities acts place a special burden [of disclosure] on insiders"). In addition, they argue that a lower standard of materiality should apply to uncontested mergers such as this one, where the management of the target company is identical with the management of the offeror. *See Blanchette v. Providence & Worcester Co.*, 428 F.Supp. 347, 354 (D.Del.1977); *Broder v. Dane*, 384 F.Supp. 1312, 1318–19 (S.D.N.Y. 1974).

■ Section 14(a) of the Securities Exchange Act and Rule 14a–9 promulgated thereunder make it unlawful for a corporation to issue a proxy statement "containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ." The Supreme Court has held that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote". *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). The fact that a proxy statement is drafted by insiders acting in their own interest does not change the standard of materiality. A fact does not become more material to the shareholder's decision because it is withheld by an insider, or because the insider might profit by withholding it.

■ This is not to say, however, that court must ignore the interests of the parties who drafted the proxy statement in deciding whether they have met their obligation to disclose material facts. Certain facts might be material in the context of a one-sided transaction that would not be material in the context of an adversarial transaction. Therefore, although the same *standard* of materiality would apply to both kinds of transaction, the standard might identify different facts as material in each transaction. In addition, when the interests of the management conflict with those of the shareholders (and we note that this may happen in a hostile takeover, where the management seeks to preserve its endangered jobs, as well as in an uncontested merger), the court is entitled to regard the management's disclosures with a certain skepticism, and to resolve doubts in favor of the shareholders. Thus, although § 14(a) requires any party soliciting proxies, regardless of his status or interest in the transaction, to disclose all material information, a self-dealing insider may have a "heavier burden of disclosure" in the sense that he will find it more difficult to convince the court that he has met the requirements of § 14(a).

■ In this case, the district court applied the standard of materiality set forth by the Supreme Court in *TSC Industries.* It found that the proxy statement had met the requirements of § 14(a) of the Securities Exchange Act, "even given the burden of disclosure in a nonadversarial setting". We find that the court applied the proper standard of materiality and properly took account of the nature of the transaction in deciding whether the proxy statement disclosed all material information. The materiality issue is "a mixed question of law and fact" whose determination "requires delicate assessments . . . [that] are peculiarly ones for the trier of fact". *TSC Industries,* 426 U.S. at 450, 96 S.Ct. at 2133. In this circuit, a mixed question of law and fact is reviewable only for clear error in the absence of some showing that the court applied the wrong legal standard. *See Sweeney v. Board of Trustees of Keene State College*, 604 F.2d 106, 109 n. 2 (1st Cir.1979) (collecting cases); *see also Nash v. Farmers New World Life Insurance Co.*, 570 F.2d 558, 561 n. 7 (6th Cir. 1978) (holding that, even though the court does not usually apply the "clearly erroneous" standard to mixed questions of fact

and law, this standard is properly applied to the materiality issue).

In their complaint, the Patriots stockholders identified a large number of facts that they regarded as having been misstated or omitted in the proxy statement in violation of § 14(a). After a lengthy trial, the district court held that they had failed to carry their burden of showing that the proxy statement was materially misleading. The stockholders argue on appeal that the district court's rulings on many of these alleged misstatements or omissions were erroneous.[2] We find that the appellants' claims fall into two categories. In the first category are claims as to which the district court correctly determined the facts, applied the correct standard of materiality, and reached conclusions that are not clearly erroneous. We affirm the district court's disposition of these claims. The second category, however, is more troublesome. In this category are claims as to which the district court either misstated the relevant facts or misconstrued the legal contexts in which those facts may have been material. When these claims are properly viewed, it may be that none of them will establish a violation of § 14(a). Nevertheless, in view of the complexity of the trial and the amount of conflicting testimony presented, and of the district court's finding that the proxy statement was "artful" and "no model of candor", we think it best to remand three of these claims to the district court for reconsideration.

## III. Claims Not Affected by Error

We address first those claims as to which the district court's rulings were not clearly

erroneous. Appellants claim that the proxy statement violated § 14(a) and Rule 14a–9 by failing adequately to disclose the reasons for the merger and the income that Patriots expected to receive from the sale of National Football League expansion franchises to Tampa Bay and Seattle. They contend that the proxy statement improperly concealed a favorable financial projection that appeared in a private statement prepared for the stadium lessor. Finally, they argue that the proxy statement should have revealed the interests of Mary Sullivan and Kidder, Peabody & Co. in the merger.

### A. Reasons for Merger and Income from Expansion Franchises

 Both the reasons for the merger and the expected income from the expansion franchises were disclosed in the proxy statement. The essence of appellants' complaint is that these pieces of information were not disclosed in the proper places or with the proper emphasis. Although it is clear that a court may base § 14(a) liability on the fact that material information is disclosed piecemeal or buried in the footnotes to financial statements, *see, e.g., Kennedy v. Tallant,* 710 F.2d 711 (11th Cir.1983); *Blanchette v. Providence & Worcester Co.,* 428 F.Supp. 347 (D.Del. 1977), it does not follow that such disclosures must be regarded as inadequate *per se.* The district court did not commit clear error in finding that this information was adequately disclosed.

### B. Financial Projection

 Two days after the vote on the merger, Sullivan prepared a "Pro Forma

---

**2.** We note in passing that appellees have advanced a novel argument concerning "material omissions" in the appellant's designated appendix. Appellees contend that appellants failed to designate all information in the record relevant to their claims that the district court's findings were erroneous. Although appellees have remedied the deficiencies in the record by counterdesignation, they argue that this court should refuse to review appellants' claims because the appendix appellants designated was inadequate. *See United States v. One Motor Yacht Named*

*Mercury,* 527 F.2d 1112 (1st Cir.1975). This suggestion is entirely at odds with the purpose of the rules governing designation and counterdesignation of appendices, which is to ensure that all relevant portions of the record are before the appellate court so that it can conduct an informed review of the parties' claims. Whether these portions of the record are placed in the appendix by the designation of the appellant or by the counterdesignation of the appellee is a matter of complete indifference to the court.

Income Statement" at the request of the stadium lessor. The projection of the Patriots' future income in this statement was substantially more favorable than the information in the proxy statement. Appellants argue that Patriots' management should have revealed these favorable expectations in the proxy statement. We disagree. The federal securities laws do not require corporate management to include speculations about future profitability in proxy statements; in fact, at the time the Patriots proxy statement was issued, the Securities and Exchange Commission frowned on such disclosures. *See Lewis v. Oppenheimer & Co.*, 481 F.Supp. 1199, 1208 & n. 6 (S.D.N.Y.1979). Of course, stockholders may point to specific information in a financial projection as evidence that the management did not disclose all the material facts in its possession; but failure to disclose the projection itself does not establish a § 14(a) violation.

#### C. Interest of Mary Sullivan in Merger

Sullivan agreed to appoint his cousin, Mary Sullivan, treasurer of Patriots at a salary of $30,000 as part of the consideration for his purchase of her voting shares. Mary Sullivan was already a director of Patriots, and she joined the other directors in endorsing the merger. Appellants argue that Mary Sullivan's interest in the merger should have been disclosed because it might have motivated her to endorse the merger.

■ The proxy statement did disclose that the result of the merger would be to concentrate ownership of Patriots in the hands of William Sullivan and Mary Sullivan. Appellants have not shown how the salary agreement between William Sullivan and Mary Sullivan gave the latter any additional "interest in the merger". William Sullivan, as the sole owner of the corporation's voting shares, could appoint Mary Sullivan treasurer of Patriots whether or not the merger with New Patriots was consummated.

#### D. Role of Kidder, Peabody & Co. in Merger

■ Finally, appellants argue that the proxy statement should have disclosed various circumstances surrounding the evaluation of Patriots' shares performed by Kidder, Peabody & Co., which recommended the offering price of $15.00 per share. The district court found that appellants had been "unable to prove any undue influence on Kidder, Peabody & Co., Inc. by the management of the Patriots". Appellants argue, however, that the proxy statement should have disclosed that Kidder, Peabody & Co. was retained at the recommendation of the Sullivans; that the firm "didn't know very much about the football club business"; and that some of the figures the firm used in reaching its $15.00 per share valuation were open to question. We cannot say of any of these pieces of information that there existed "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available". *TSC Industries*, 426 U.S. at 449, 96 S.Ct. at 2132 (footnote omitted).

#### IV. Claims Affected by Error

We turn next to those matters as to which appellants claim that the district court misconstrued either the relevant facts or the legal contexts in which those facts may have been material. Four pieces of information fall into this category: the prices of the expansion franchises, the original issuance price of the voting stock, the expected increase in income from the local media broadcasting contract, and William Sullivan's use of corporate funds to maintain compensating balances. We find as a matter of law that Patriots management had no duty to disclose the prices paid for expansion franchises, so we affirm the court's refusal to base § 14(a) liability on this nondisclosure. We believe, however, that whether the remaining three pieces of information were material and should have been disclosed is an open question. Mindful of the Supreme Court's observation

that the determination of materiality "requires delicate assessments ... [that] are peculiarly ones for the trier of fact", we remand these claims to the district court to decide whether, individually or collectively, they establish a violation of § 14(a).

We turn now to a discussion of the individual claims.

### A. Sale Prices of Expansion Franchises

Appellants argue that the proxy statement should have disclosed not only the Patriots' share of the income from the Tampa Bay and Seattle expansion franchises, but also the sale prices of the franchises themselves. They point out that in order to decide whether to vote in favor of the merger or against it, they had to judge whether the offered price of $15.00 per share represented the "fair value" of their stock. If they judged that the "fair value" of their stock was considerably higher than $15.00, they would vote against the merger. If a majority of shareholders voted against the merger, New Patriots would be forced to raise its offering price or abandon the merger plans; if those who opposed the merger were in the minority, they could still exercise their statutory appraisal rights in order to obtain a judicial determination of the "fair value" of their shares. Appellants argue that the value of the NFL expansion franchises was some indication of the value of the Patriots franchise, that the value of the Patriots franchise was a material component of the corporation's "net asset value", and that the "net asset value" was a significant part of the "fair value" of Patriots shares. By this circuitous route appellants arrive at the conclusion that the sale prices of the Tampa Bay and Seattle franchises were material and should have been disclosed to Patriots stockholders.[3]

The district court did not focus on the relevance of the franchise value in a statutory appraisal proceeding. Instead, it found that franchise value would only be relevant in a liquidation of Patriots' assets, and that this information was "not material because there was a negligible chance that nonvoting stockholders would participate in a liquidation in the near future".

 Although it is possible that franchise value *would* be material in the context of an appraisal proceeding, we think it unlikely that § 14(a) requires a corporation to disclose every piece of information that might be relevant in a state appraisal proceeding. In fact, several courts have suggested that for a corporation to include asset appraisals in a proxy statement might constitute a violation of § 14(a) because such appraisals are inherently speculative and may mislead shareholders. *See, e.g., South Coast Services Corp. v. Santa Ana Valley Irrigation Co.,* 669 F.2d 1265, 1271 (9th Cir.1982) ("Both the courts and the S.E.C. have consistently discouraged the inclusion of appraised asset valuations in proxy materials"); *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1292 (2d Cir.1973) ("[I]t is clear that the policy embodied in the note to Rule 14a–9 [which gives examples of misleading disclosures] has consistently been enforced to bar disclosure of asset appraisals as well as future market values, earnings, or dividends"). Given these cases, we find that Patriots had no duty to appraise its assets and disclose their value, particularly when the relevance of doing so would simply be to help a shareholder decide whether to assert a statutory "appraisal right". Nor do we see any duty to disclose the similarly speculative piece of information here at issue, the relevance of which is related only to this asset value.

---

**3.** The question arose at oral argument whether the importance of franchise value to a shareholder considering whether to exercise appraisal rights had been argued at trial with sufficient clarity to preserve the point for appeal. After reviewing the submissions of both parties, we find that this is a very close question. We conclude, however, that the testimony and memoranda appellants presented at trial concerning the relationship of the franchise value to "fair value", and of "fair value" to a statutory appraisal proceeding—though obscured by much irrelevant discussion—sufficed to preserve this point.

Appellants rely on *Securities and Exchange Commission v. Parklane Hosiery,* 558 F.2d 1083 (2d Cir.1977), for the proposition that the proxy must disclose to shareholders all information disclosed to the investment banking firm that appraises the value of the corporation's shares and recommends an offering price. Appellants misconstrue *Parklane,* which actually holds that when a corporation fails to disclose vital information to the investment banking firm appraising its shares, this *defect* in the appraisal is a material fact that must be disclosed to shareholders. 558 F.2d at 1087, 1089. Although appellants quarrel with some of Kidder, Peabody & Co.'s computations, they have not shown that the firm based its appraisal of share value on inadequate information. In fact, the firm's opinion letter reveals that it considered the sale prices of the Seattle and Tampa Bay franchises in determining Patriots' value as a "going concern".

Even if we were to assume that Patriots had a duty to disclose any information that would have been relevant in a Massachusetts appraisal proceeding, it was by no means obvious in 1976, when the proxy statement was drafted, that the value of NFL expansion franchises would play a significant role in such a proceeding. Appellants rely heavily on a case decided several years later, in which a Massachusetts court considered "net asset value" an important component of the fair value of the stock in a professional hockey team and used the sale price of a new franchise as the starting place for determining the "asset value" of the established team's franchise. *Piemonte v. New Boston Garden Corp.,* 377 Mass. 719, 387 N.E.2d 1145 (1979). We note, however, that the SEC has not imposed a clairvoyance requirement on the drafters of proxy statements: the drafters are charged with disclosing information that is material "at the time and in the light of the circumstances" under which the proxy statement is drafted. *See* Rule 14a–9(a). At the time the Patriots' proxy statement was drafted, the role of new franchise prices in determining the value of an existing franchise was not es-

tablished, and the significance of "net asset value" itself varied from one appraisal proceeding to the next. *See, e.g., Endicott Johnson Corp. v. Bade,* 37 N.Y.2d 585, 587, 376 N.Y.S.2d 103, 106, 338 N.E.2d 614, 616 (1975) ("[T]he weight to be accorded to [net asset value, investment value, and market value] varies with the facts and circumstances in a particular case"). At the time the Patriots' proxy statement was written, the sales prices of expansion franchises were not material to the shareholders' decision whether or not to vote in favor of the merger.

**B. Issuance Price of Voting Stock**

■ The proxy statement revealed that the non-voting shares had originally been issued for $5.00 per share, but did not disclose that the issuance price of the voting shares had been $2.50 per share. Appellants argue that the issuance price of the voting shares was material in light of the fact that Sullivan subsequently purchased the voting stock at prices in excess of $100 per share, while he offered only $15.00 per share for the nonvoting stock. In support of this argument, appellants point to an internal memorandum from Sullivan's attorneys asking that the aggregate initial prices paid for the different classes of stock be deleted from the draft of the proxy statement because Sullivan was "concerned about disclosing the gain made by the voting stockholders". The district court's finding that "[b]oth classes of shares were originally issued for $5.00 a share" is clearly erroneous. We remand to the district court to consider whether the issuance price of the voting shares was material and should have been disclosed in the proxy statement.

**C. Income from Local Media**

■ The proxy statement revealed that the Patriots' local media broadcasting contract extended through 1980, but it did not disclose that the terms of the contract had been renegotiated in the summer of 1976 so that they were more favorable to Patriots. As a result of the renegotiation, the 1976

income from the local media was approximately $75,000 higher than the 1975 income. Appellants argue that this increase in local broadcasting revenues was material and should have been disclosed, particularly in light of the fact that the proxy statement emphasized a $165,000 decline in revenues from national network broadcasting. The district court's finding that there was no evidence of "concealment of any certain source of future revenue" is clearly erroneous. We note that the $75,000 income increase for 1976 amounted to less than 1% of Patriots' 1975 operating revenue, and that such a small amount, considered by itself, might well be immaterial. But, because the district found that the proxy statement as a whole was "no model of candor", and because the proxy statement suffered from the other specific defects we have noted, we think it best to allow the court to weigh the concealment of the local broadcasting revenue in the balances as it determines whether or not the proxy statement was materially misleading. We remand this claim to the district court.

### D. Compensating Balances

Appellants contend that William Sullivan improperly used corporate funds to maintain compensating balances at banks that had loaned him money to finance his purchase of voting shares in Patriots. The district court found that this was "an improper use of funds for Sullivan's benefit". It concluded, however, that plaintiffs had failed to demonstrate the materiality of the compensating balances because they had not shown "to what extent this practice affected income". The court found that the Patriots' operating expenses required the corporation to maintain large cash reserves. It observed that plaintiffs had failed to show that the compensating balance requirement increased the amount of

cash held in these reserves. Appellants advance two challenges to this finding. First, they argue that Mr. Sullivan's financing arrangement should have been disclosed because it constituted a breach of fiduciary duty. Second, they contend that the Securities and Exchange Commission has established that agreements to maintain compensating balances of this size are *per se* material.

■ Although the district court erred in holding that "nondisclosure of a breach of fiduciary duty or waste of corporate assets is never material for purposes of § 14(a)", appellants have not demonstrated that Sullivan's improper activity was material in the context of this transaction. A breach of fiduciary duty involving self-dealing by a corporate officer would plainly be material to a proxy statement soliciting votes for the re-election of that officer. *See Gaines v. Haughton*, 645 F.2d 761 (9th Cir.1981). In this case, however, the question before the shareholders was whether or not to accept $15.00 per share for their Patriots stock; appellants have not shown how the improper conduct of the corporation's director was material to this question.[4]

Appellants point out that a regulation promulgated by the Securities and Exchange Commission, 17 C.F.R. § 240.14a–101, Item 15(a), requires that a proxy statement issued in connection with a merger contain financial statements "prepared and certified in accordance with Regulation S–X", and that Regulation S–X, 17 C.F.R. § 210.5–02–1, requires the disclosure of compensating balance arrangements. This requirement is qualified by the "Rule of General Application" set forth in 17 C.F.R. § 210.4–02, which provides, "If the amount which would otherwise be required to be shown with respect to any item is not material, it need not be separately set forth".

---

4. We are not persuaded by the argument that "the merger vote was in effect a referendum on Mr. Sullivan's fitness for stewardship of the corporation, because a negative vote might have resulted in a change of control ...." The reasonable course for a shareholder who believed that control of the corporation had fallen into untrustworthy hands would have been to vote in favor of the merger and invest his $15.00 elsewhere. Likewise unpersuasive is the argument that the shareholders would have accepted Mr. Sullivan's recommendation of the merger less readily had they known that he was using corporate funds to secure personal loans.

The district court found that the compensating balance arrangements maintained by Mr. Sullivan were not material because they had no demonstrable effect on the Patriots' interest income.

Appellants argue, however, that the Securities and Exchange Commission's Accounting Series Release No. 148, which explains the Commission's policy regarding the disclosure of compensating balances, sets a different standard. The release begins by noting:

"Compensating balances are to be segregated on the balance sheet only if they are legally restricted under the terms of the arrangement while any other determinable amounts of funds which are held as compensating balances are to be disclosed in the notes to the financial statements. Segregation recognizes that certain cash balances at the balance sheet date are not readily available for discretionary use by management. Footnote disclosure emphasizes information about financial management decisions which effectively restrict the availability of cash funds over time for alternative income yielding opportunities even though no legal restrictions exist which preclude such use." 38 Fed.Reg. 32440 (1973).

The release makes clear that compensating balances are not to be "offset" by the amount of the cash reserve that the corporation would maintain in the absence of a compensating balance requirement:

"It has been argued that, in those cases where part of the compensating balance reflects funds that would be held anyway as a minimum operating balance, such funds should be subtracted from compensating balances since the maintenance of such a compensating balance has no incremental cost to the borrower. For purposes of these disclosure requirements, such a subtraction is not appropriate. The concept of subtraction implies that the compensating balance is of secondary importance and this is by no means apparent. It would be equally reasonable to contend that operating funds are free of cost because compensating balances must be maintained. In any event, the utilization of such amounts for compensating balances precludes the sound cash management alternative of investing available cash in highly liquid interest bearing securities." 38 Fed.Reg. 32441.

Finally, the release explains the standard of materiality to be applied to compensating balance arrangements:

"In determining whether compensating balance arrangements are sufficiently material to require segregation or disclosure, various factors should be considered. Among these may be the relationship of the amount of the balances to total cash, total liquid assets and net working capital, and the impact of the balances on the effective cost of financing. In the usual case, reportable compensating balances which in the aggregate amount to more than 15 percent of liquid assets (current cash balances, restricted and unrestricted, plus marketable securities) would be considered to be material. Lesser amounts may be material if they have a significant impact on the cost of financing.

"Compensating balances maintained by the company for the benefit of affiliates, officers, directors, principal stockholders or other similar parties may be of particular significance to investors. Separate disclosure of such balances may be required under other Commission rules and regulations even if they are not of a magnitude such that they would meet the materiality guidelines set forth above." 38 Fed.Reg. 32441.

■ The district court's observation that it was "unable to determine what amounts should have been invested [in interest-bearing accounts] given the corporation's obvious need for ready cash" suggests that it used a cash reserve "offset" of the type disapproved in the Commission's release. We remand the compensating balance claim to the district court for reconsideration in light of the standard set forth in Accounting Series Release No. 148. These are some of the points the court may wish to consider on remand: (1) whether the compensating balances involved "determinable amounts" of corporate funds that would be subject to the disclosure guide-

lines in the release; (2) whether the compensating balances were "restricted", so that they would be affected by the guidelines for segregated disclosure, or "unrestricted", so that they would be affected by the guidelines for footnote disclosure; (3) whether the compensating balances amounted to more than 15% of Patriots' liquid assets and so would fall within the release's presumption of materiality.

We note that the failure to disclose the existence of compensating balances is more likely to have *overstated* than to have *understated* Patriots' profitability. Since the point of appellants' argument is that the proxy statement induced them to sell by *understating* material sources of income, the concealment of the compensating balances might not have been material to them—indeed, it might have tended to counteract the harm of which they complain. On the other hand, it might be argued that the Commission's guidelines create a *per se* rule that the nondisclosure of compensating balances in excess of 15% of liquid assets constitutes a material omission. We express no opinion on the question whether the district court *must* find that the proxy statement violated § 14(a) if the statement failed to disclose compensating balances in excess of 15% of liquid assets, or whether it may find no violation if it determines that the compensating balances were not material to these shareholders. The court may, of course, accept briefs from the parties on this issue or invite the Securities and Exchange Commission to file an amicus brief if the court believes that additional information would be helpful.

If the court determines on remand that the Patriots proxy statement violated § 14(a), it has broad power to fashion appropriate remedial relief. *See J.I. Case Co. v. Borak,* 377 U.S. 426, 433–35, 84 S.Ct. 1555, 1560–61, 12 L.Ed.2d 423 (1964). It may, for example, restore the plaintiffs to the position they would have occupied as dissenters to the merger and allow them to receive the "fair value" of their shares as determined in the appraisal proceeding now pending in Norfolk Superior Court; or it may grant other appropriate relief. *See*

*generally Securities and Exchange Commission v. MacDonald,* 699 F.2d 47 (1st Cir.1983); *Janigan v. Taylor,* 344 F.2d 781 (1st Cir.1965) (discussing the purpose and nature of damage remedies under the securities laws).

The § 14(a) claim was only one of nine claims that plaintiffs originally brought against the Patriots' management. They waived two claims before trial. The court's findings of fact and rulings of law specifically addressed only the § 14(a) claim; it dismissed the remainder of the suit with the sentence, "[Plaintiffs'] other claims for relief have either been waived or are without merit". Appellants argue that this conclusion of law, unsupported by specific findings of fact, violates Fed.R.Civ.P. 52(a), which provides that the court in a bench trial "shall find the facts specially and state separately its conclusions of law thereon".

Although it is possible that the court correctly found the remaining claims to be without merit, we find it difficult to review the court's ruling without the separate findings of fact and conclusions of law called for in Rule 52(a). Because we are remanding the case in any event, we would like to give the court the opportunity to supplement its findings of fact and conclusions of law on those claims that the plaintiffs did not waive.

We hasten to add that we believe both parties had an ample opportunity to develop a full record at trial. Although the appellants complain that the court improperly excluded various exhibits, we find their arguments unconvincing, and we affirm the court's evidentiary rulings. On remand, the court may, of course, require the parties to submit or present any additional information that it considers appropriate; but our ruling should not be construed as *requiring* the court to hear additional argument or to admit additional evidence.

*The judgment of the district court is affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. No costs at this time.*