**HOWING COMPANY, Douglas McLellan, Plaintiffs–Appellants,**

v.

**NATIONWIDE CORPORATION, Nationwide Mutual Insurance Company, Defendants–Appellees.**

No. 89–4084.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 4, 1990.

Decided March 6, 1991.

William R. Jacobs (argued), Strauss & Troy, Cincinnati, Ohio, for plaintiffs-appellants.

Frederick J. McGavran, Frost & Jacobs, Cincinnati, Ohio, Jeffrey S. Davidson (argued), Kirkland & Ellis, Los Angeles, Cal., for defendants-appellees.

Before MERRITT, Chief Judge; GUY, Circuit Judge; BROWN, Senior Circuit Judge.

MERRITT, Chief Judge.

In this securities action by minority public shareholders arising from a freeze-out merger of a subsidiary, Nationwide Corporation, with its parent, Nationwide Mutual, which at the time of the merger owned approximately 85% of the shares of the subsidiary, we previously reversed the District Court's dismissal of plaintiffs' claims under SEC Rule 13e–3, governing going-private transactions or freeze-out mergers; and we then remanded the case to the District Court for further proceedings. We refer the reader to our earlier opinion for a detailed statement of the facts and the law applicable to such mergers under Rule 13e–3. *See Howing Co. v. Nationwide Corp.,* 826 F.2d 1470 (6th Cir.1987), *cert. denied,* 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988).

## I. Materiality Under Rule 13e–3

In our earlier opinion, we found that the defendant corporations in their going-private offer to the minority public shareholders had violated Item 8 required under Rule 13e–3 by making no effort to state, discuss or explain in reasonable detail the net book value, the going concern value or the liquidation value of the company whose minority interests were purchased. On remand, the District Court concluded that such a discussion would not have provided a shareholder with information of "material" value under the legal standard of "ma-

teriality" in securities transactions set out in *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). The District Court therefore granted summary judgment for the defendant corporations which were responsible for the proxy statement we had previously found defective under Item 8 of Rule 13e–3.

The District Court based its grant of summary judgment on the ground that it is so clear and beyond dispute that the information on these values would not be of significance to a shareholder that no reasonable trier of fact—in this case a jury—could reach a contrary conclusion. We do not agree that the insignificance of the information is so clear, and we therefore remand the case for trial. The instructions for Item 8 of Rule 13e–3, as we have previously observed, are clear and specific in their requirement for a discussion of book, going concern and liquidation value in the fairness section of the proxy statement. They say that the issuer "should discuss in reasonable detail," among other things, the net book value, going concern value and liquidation value and "to the extent practicable, the weight assigned each factor." This and other information is specifically required by the SEC because these freeze-out transactions, unlike tender offers and other market transactions, are conducted outside the discipline of the competitive market place in which freedom of contract is the norm. As the SEC has noted, such "going private transactions present an opportunity for overreaching" and are "coercive" because of "the lack of arms-length bargaining and the inability of [minority shareholders] to influence corporate decisions to enter into such transactions."[1] Exchange Act Release No. 34–17719, *reprinted in* 3 Fed.Sec.L.Rep. (CCH) ¶ 23,709, at 17, 245–42 (April 13, 1981).

■ Although we agree with the District Court that the general *TSC* standard of materiality is applicable to transactions governed by Rule 13e–3, the clear and specific language of the instructions to Item 8 creates in effect a presumption that a discussion of book, going concern and liquidation value in the proxy statement would be material to a reasonable shareholder. The presumed fact—that the investor would likely find disclosure of such information significant—follows from Item 8's insistence that the information be stated.

■ The failure to state the information triggers the presumption which the defendants may then rebut in the normal way under Rule 301 of the Federal Rules of Evidence. If the party adverse to the presumption offers no evidence contradicting the presumption of materiality, the court will instruct the jury that it may presume the omissions are material. If the adverse party presents evidence suggesting the insignificance of the omitted information, the right of the plaintiffs to have the jury consider the significance of the information persists, and the jury may infer that the information would be significant, unless and until evidence has been received which would require a directed verdict for the defendants on the significance of the information. The persuasiveness of the evidence so far presented by the defendants does not rise to that level, and hence the District Court should not have granted summary judgment.

The Supreme Court has made use of rebuttable presumptions in analogous factual circumstances in securities law cases. In a 10b–5 action, the Court upheld the use of a rebuttable presumption of reliance where a company misled sellers of its stock by not disclosing that it was engaged in

---

1. Most commentators, even those who disagree over the method and degree of regulation of going private transactions, agree with the SEC that, in certain contexts, going private transactions present opportunity for abuse, similar to insider trading. *Compare* Brudney, *A Note on Materiality and Soft Information Under the Federal Securities Laws*, 75 U.Va.L.R. 723, 739 (1989) ("When a controlling block or a substantial portion of the corporation's stock is owned by one person or a coherent group, corporate dealing in its own securities, particularly repurchase of its own securities, is not significantly different from insider trading"), *with* Easterbrook & Fischel, *Corporate Control Transactions*, 91 Yale L.J. 698, 707 (1982) ("Some going-private transactions may be motivated by a desire to exploit inside information rather than to reduce agency costs").

merger negotiations. *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The Court justified adopting this rebuttable presumption because of the "unnecessarily unrealistic evidentiary burden" that plaintiffs otherwise would have had in showing how they would have acted if the omitted information had been stated. *Id.*, 108 S.Ct. at 990. *See also Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) (upholding rebuttable presumption of reliance where material omission made in proxy statement). Similarly, in the instant case, in which the question is what "would be" the reaction of reasonable shareholders to the information, the omission should raise a rebuttable presumption. The likelihood that the factors the SEC has enumerated in Item 8(b) will be material is sufficiently strong that omission of such factors without explanation of the reason for the omission will result in a rebuttable presumption of their materiality.

Establishing a presumption of materiality as to factors listed in Item 8(b) is in accord with other courts that have recognized the appropriateness of a "heightened" *TSC* materiality standard in coercive securities transactions such as this one. For example, in *Pavlidis v. New England Patriots Football Club, Inc.*, 737 F.2d 1227, 1231 (1st Cir.1984), the First Circuit concluded that a heightened *TSC* standard should govern in a freeze-out merger where an allegedly misleading proxy statement was drafted at the direction of a shareholder who owned the controlling interest in a corporation at the time of a merger. Discussing materiality in the context of § 14(a) of the Securities Act and Rule 14a–9 promulgated thereunder, the Court found that certain facts may be material in the context of a "one-sided transaction" which otherwise would not be material in the context of an adversarial transaction. *Id.* Specifically, the First Circuit stated that, even though § 14(a) requires any party soliciting proxies to disclose all material information regardless of status or interest, a self-dealing insider may have a "heavier burden of disclosure" in meeting the § 14(a) disclosure requirements. *Id.;*

accord *Plaza Securities Co. v. Fruehauf Corp.*, 643 F.Supp. 1535, 1544 (E.D.Mich. 1986) ("disclosures and nondisclosures [pursuant to Rule 13e–3] must be especially rigorous" where management involved in leveraged buyout designed to take company private); *Blanchette v. Providence & Worcester Co.*, 428 F.Supp. 347, 354 (D.Del. 1977) ("importance of a complete disclosure . . . is enhanced" where management controls the offeror corporation, as well as the offeree corporation; specifically, "management has a heavy burden to insure that disclosure is complete and nonmisleading, especially with respect to shareholders whose interests may differ from their own").

■ In this action, defendants have not rebutted this presumption so as to avoid trial because they have not established the lack of significance of the information with sufficient clarity. The facts do not justify the grant of summary judgment on the ground that a reasonable investor would not find an explanation of book, going concern and liquidation value of any significance.

For example, plaintiffs' expert stated, and defendants' evaluator, First Boston Corp., appears to agree, that a relevant factor in a book value analysis is the multiplier, which is a number multiplied by book value to yield total selling price. According to plaintiffs' expert testimony, which is not effectively contradicted by defendants, insurance companies typically sell in a range from one to four times book value, with unhealthy companies selling in the lower range and more profitable companies selling at higher ratios. The cash out price of $42.50 paid by defendants is only slightly greater than book value, with a resulting multiplier of 1.025. Thus, it may well be that a reasonable shareholder would have found a discussion of this low multiplier (and of the multiplier range typical in purchases of insurance companies) important in deciding how to vote his shares.

We note that determining the value of a company from its book value multiplied by some "appropriate" industry multiplier is often an inexact method of valuation be-

cause book value measures nothing more than the value of a company's assets (minus liabilities) at the time the assets are added to a company's books. Obviously, in some cases, book value multiplied by some industry multiplier will not be a useful method to calculate a company's value. Accordingly, the corporation would state in its proxy materials that book value is not relevant to the "fairness" opinion, setting forth the factors leading it to this determination of irrelevancy. Where a defendant does base its "fairness" opinion in part on a comparison of book value to the cash out price, it should discuss in reasonable detail the multiplier used and why that multiplier is appropriate. In the instant case, the record strongly suggests that defendants used book value as an important factor in determining the "fairness" of the transaction and that they sought to use a multiplier of one. Some discussion of book value and the appropriateness of this multiplier for a company like Nationwide Corp. was warranted in the proxy materials.

Likewise, defendants did not discuss in the proxy materials the going concern and liquidation values or explain why they were not discussed. Like book value, defendants merely stated in conclusory language that they had considered these factors without stating what they were, how they were derived or their significance. In the proceeding below, defendants claimed that liquidation and going concern values were considerably lower than the cash out price offered minority shareholders. They presented evidence that Nationwide Corp. had no significant assets which could be sold for more than their book value, that New York insurance law would have frozen more than half of the value of total shareholders' equity ($260 million out of $462.2 million) that could be distributed in a liquidation and that Nationwide Corp. lacked an independent sales force which would have greatly decreased its value if sold as a going concern.[2] *See Howing Co.*

*v. Nationwide Corp.*, No. 1-83-1693, at 7-9, 1989 WL 200973 (S.D. Ohio, Nov. 16, 1989). In response, plaintiffs introduced plausible expert testimony which contradicted defendants' contentions and which suggested that liquidation and going concern values were higher than the cash out price offered to minority shareholders. Because reasonable minds could have differed on whether the omitted discussion of liquidation and going concern values would be significant to a reasonable shareholder, the District Court erred in not letting the jury make this determination.

## II. State Law Fiduciary Claim

In our earlier opinion, we asked the District Court to consider plaintiffs' state law breach of fiduciary duty claims. On remand, the District Court concluded that no fiduciary duty could have been violated by Nationwide Corp. or Nationwide Mutual, the majority shareholder, because of the "extraordinary" procedural steps taken to safeguard the interests of the public shareholders of Nationwide Corp. The District Court therefore granted summary judgment for defendants.

Plaintiffs did not sue the directors of Nationwide Corp. for breach of fiduciary duty, only the corporate entity itself. Because such a fiduciary claim must be made against a corporation's directors, and may not be maintained against the corporation itself under a theory of vicarious liability, *see, e.g., Radol v. Thomas*, 772 F.2d 244, 258 (6th Cir.1985), *cert. denied*, 477 U.S. 903, 106 S.Ct. 3272, 91 L.Ed.2d 562 (1986), plaintiffs' only arguable claim is against Nationwide Mutual in its capacity as majority shareholder of Nationwide Corp.

On appeal, plaintiffs argue that Nationwide Mutual, as majority shareholder, had a strong fiduciary duty to pay a fair price and to make full disclosure, fiduciary

---

**2.** The defendants contend that Nationwide Corp. sold its policies through captive agents who are associated with two affiliated companies. Since these agents made most of their income by selling the affiliated companies' policies, defendants claim that if Nationwide Corp. was liqui-
dated or sold in pieces, these agents likely would have retained their associations with the affiliated companies rather than going with Nationwide Corp., which would have had the effect of reducing the going concern and liquidation values of the company.

duties they claim Nationwide Mutual breached.

Traditionally, shareholders did not owe any fiduciary obligations to each other; any shareholder voting its own shares presumably could act solely in its own self-interest. Recently, however, courts have come to recognize that a majority shareholder can control the corporation for its own benefit, sometimes to the detriment of the minority shareholders, through the election of directors who favor its interests. Although courts acknowledge this potential conflict, the majority shareholder fiduciary duty that has developed is less stringent than the duty owed by a trustee under traditional notions of trust law. State courts, including the courts of Ohio whose law is applicable, have had difficulty establishing a workable standard defining the "fiduciary duties" of a majority shareholder that acquires the stock of public shareholders in a freeze-out merger. The normal principles of complete loyalty owed by a trustee to a beneficiary do not work because a majority shareholder in such situations has a built-in conflict of interest with the minority shareholders. Regular trustees, under normal principles of fiduciary duty, may not engage in self-dealing, purchase the assets of the trust or have personal interests in trust transactions that could affect their judgment. Restatement (Second) of Trusts § 170(1) comments a-c (1959). These same principles normally apply to other fiduciaries like guardians, lawyers, agents, officers and directors. Restatement of Restitution § 190 (1937). Going private transactions between majority and minority shareholders violate all these principles.

In deriving an appropriate fiduciary duty for majority shareholders, it may be helpful to think of fiduciary duties as enforcement devices for implementing the intent of the minority and majority shareholders as to what benefits and risks the parties would agree *ex ante* to share. *See* Hetherington, *Defining the Scope of Controlling Shareholders' Fiduciary Responsibilities*, 13 Canada–United States L.J. 103, 110 (1988). As commentators have noted, majority and minority shareholders would al-

most never agree to a traditional trust relationship because such a relationship would not be in either's economic interest. *See id.* at 126–27; *see also*, Easterbrook & Fischel, *Corporate Control Transactions*, 91 Yale L.J. 698, 726 (1982). Buyers of stock in a corporation usually purchase the stock for the profits the company generates, whether paid out or retained, subject to the possibility that, lacking a controlling interest, the shareholder will be forced at any time to sell at a "fair price." So long as the minority shareholders are paid a "fair price" for their shares in the cash out merger, and statistics uniformly suggest that minority shareholders in such transactions are paid a substantial premium to the prevailing market price, there is no reason to expect *ex ante* that minority shareholders would want to limit the majority shareholder's ability to force minority shareholders to sell their shares, or, for that matter, to prevent the majority shareholder from receiving a premium for its shares. *See* Heatherington, *Defining the Scope of Controlling Shareholders' Fiduciary Responsibilities*, 13 Canada–United States L.J. 103, 126–27 (1988).

█ In accord with this rationale, the general rule that has developed regarding the majority shareholder's fiduciary duty is that a majority shareholder may "cash out" the minority shareholders for any reason, so long as the majority shareholder pays a "fair" price and fully discloses relevant facts about the value of the corporation whose stock it is buying. *See, e.g., Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983). The Ohio Supreme Court seems to follow this general rule imposing a fiduciary duty on majority shareholders. *See, e.g., Armstrong v. Marathon Oil Co.*, 32 Ohio St.3d 397, 513 N.E.2d 776, 798 (1987); *see also Crosby v. Beam*, 47 Ohio St.3d 105, 548 N.E.2d 217, 220 (1989) (discussing somewhat analogous situation of controlling shareholder's duty in close corporation). On appeal, plaintiffs assert as one component of their breach of duty claim that, where a majority shareholder controls both sides of the transaction, the burden is on the majority shareholder to demonstrate

the "entire fairness" of the transaction to minority shareholders. This argument follows the law of Delaware and other states. *See, e.g., Weinberger,* 457 A.2d 701.

 Ohio law, while recognizing that a majority shareholder must pay minority shareholders a "fair price" for their shares, nonetheless limits recovery in almost every situation[3] to recovery under the state's appraisal statute, Ohio Rev.Code Ann. § 1701.85 (Supp.1989). *See Armstrong,* 513 N.E.2d 776, 798; *see also Stepak v. Schey,* 51 Ohio St.3d 8, 553 N.E.2d 1072 (1990). In *Armstrong,* minority shareholders asked the Ohio Supreme Court to adopt Delaware law and to inquire (as Delaware courts do) into the "entire fairness" of a cash out transaction. Such an inquiry would have allowed minority shareholders to present evidence (under the theory of breach of fiduciary duty) that the cash out price paid to them was unfair. 513 N.E.2d at 797–98. The Ohio Supreme Court rejected this argument, noting that a statutory proceeding is the sole means of determining the value of shares sold by minority shareholders in a cash out merger. *Id.* Because Ohio law as set forth in *Armstrong* dictates otherwise, plaintiffs' argument on appeal, that the district court applying Ohio law should have inquired into the "entire fairness" of the transaction, must fail.

 Plaintiffs also contend that Nationwide Mutual did not disclose material facts concerning the merger price in its proxy statement. As to this issue, we find that summary judgment should not have been granted. Following the general statement of a majority shareholder's fiduciary duty, Ohio courts seem to acknowledge that a majority shareholder owes minority shareholders a fiduciary duty to disclose "pertinent facts concerning the merger." *Stepak,* 553 N.E.2d at 1078 (Holmes, J., concurring); *see also Armstrong,* 513 N.E.2d at 798 (acknowledging that other causes of action may be available under breach of

fiduciary duty claim so long as not seeking additional compensation under theory of inadequate price).

As we determined in Section I of this opinion, plaintiffs have presented evidence that defendants omitted material information in their proxy statement that is required by Rule 13e–3. On appeal, plaintiffs contend that the omission of this same information (required by Rule 13e–3) constitutes a violation of Nationwide Mutual's majority shareholder fiduciary duty. Because Ohio law seemingly permits limited recovery on the narrow ground that full disclosure was not made in the majority shareholder's proxy statement, the district court on remand should try this state law claim.

In effect, plaintiffs have only one claim (although stated alternatively as a legal claim for a violation of Rule 13e–3 and as an equitable claim for a violation of the majority shareholders fiduciary duty): that non-fraudulent, material omissions concerning the "fairness" of the cash out price were made in the proxy statement. Because plaintiffs do not claim in the briefs on appeal that Nationwide Mutual, the majority shareholder, failed to disclose specific information other than that required by Rule 13e–3, we do not reach the question whether, under Ohio law, a majority shareholder has additional disclosure burdens beyond those required by federal law. Accordingly, because of the limited claim plaintiffs make, we expect that proof of material omissions and resulting damages, if applicable, will be similar under either theory (Rule 13e–3 or state law fiduciary duty claim). In any event, plaintiffs may recover, if at all, only once because their injury is the same whether they proceed under state or federal law.

We have reviewed all of plaintiffs' claims on appeal and conclude that the District Court erred in granting summary judgment on plaintiffs' Rule 13e–3 claim, as described above, and on plaintiffs' claim under Ohio

---

**3.** Extra-statutory damages are available where the merger or acts of the officers and directors are fraudulent, unlawful or *ultra vires. See Stepak v. Schey,* 553 N.E.2d 1072 (Ohio 1990)

(Holmes, J., concurring). However, as we determined in our earlier opinion, there was no fraud or unlawful activity in this merger.

law that Nationwide Mutual breached its fiduciary duty as majority shareholder to disclose the information specified under Item 8 of Rule 13e–3. Accordingly, to this extent, the judgment of the District Court is reversed and the case remanded for trial on the two remaining issues.

RALPH B. GUY, Jr., Circuit Judge, dissenting.

I believe that the district court judge properly analyzed the issues in this case and found them appropriate for disposition by summary judgment. I would affirm on the basis of the district court's opinion.