ARMSTRONG ET AL., APPELLEES; HARRELL, APPELLEE AND
CROSS-APPELLANT, *v.* MARATHON OIL COMPANY, APPELLANT.

[Cite as Armstrong *v.* Marathon Oil Co. (1987), 32 Ohio St. 3d 397.]

398

(Nos. 86-399 through 86-405 — Decided September 25, 1987.)

*Ulmer, Berne, Laronge, Glickman & Curtis, Marvin L. Karp* and *Stephen A. Markus,* for appellees Armstrong et al.

*Weasel & Brimley* and *John F. Kostyo,* for appellee White.

*Benesch, Friedlander, Coplan & Aronoff, John J. Duffey* and *Jack Gregg Haught,* for appellee Price, Trustee.

*Dorothy M. Harrell, pro se.*

*Jones, Day, Reavis & Pogue, John L. Strauch, John M. Newman, Jr., Robert R. Weller, Susan J. Becker, Rakestraw & Rakestraw* and *Russell E. Rakestraw,* for appellant.

*Murray & Murray Co., L.P.A., Dennis E. Murray* and *Kirk J. Delli Bovi,* urging reversal for *amici curiae,* Charles Nickels et al.

HOLMES, J.

I

We deal here with the difficult subject of the manner and criteria for the determination of the amount to be paid to a dissenting shareholder of a corporation which is to be merged into, or whose assessts are to be sold to, an acquiring corporation. More specifically, we are asked to construe the Ohio statutes which provide for the compensation payable to such dissenting shareholders, and the case law which has construed such statutes.

Before addressing the issues presented for resolution, we will first set forth some of the background on the subject, the pertinent portions of the

current, applicable sections of law, and the legislative history of Ohio's and other states' statutes. We will also consider this court's case law as well as the determinations of other Ohio courts on the subject.

In considering the background of the statute at issue, we begin by noting that early corporations more closely resembled the ordinary partnership of today, in that the shareholder usually had a personal financial investment and, more importantly, played a superintending role in the business to protect his investment. Consequently, the courts of that time viewed the relationship between shareholder and corporation as a vested property right, and the vote of a shareholder owning a single share of stock was sufficient, by the common-law rule, to block any merger, sale of major assets or other organic change.[1] Absolute unanimity of all shareholders was required to effect any fundamental corporate change. The basic theory underlying such rule was that the stockholder had purchased a portion of a going concern, and his approval was necessary to divest him of that which he had purchased.

Tremendous expansion of commerce in the latter part of the nineteenth century created the need for larger, more complex financial structures. As corporations began to merge and otherwise reorganize to meet this need, they encountered the barrier of the minority shareholder backed by the common-law requirement of unanimity. See, *e.g.*, *Mason* v. *Pewabic Mining Co.* (1890), 133 U.S. 50 (shareholder objection destroyed the company); *In re Timmis* (1910), 200 N.Y. 177, 181, 93 N.E. 522, 523 (purchase of a single share to create a strike suit). This rule was, of course, much too restrictive to meet the needs of a growing, modern economy and, thus, corporations began to circumvent this rule by giving dissenters cash payments. In order to prevent excessive costs from upsetting the transaction, courts began to reduce the effect of the rule of unanimity by granting dissenting shareholders the right to recover the cash value of their shares. See, *e.g.*, *Lauman* v. *Lebanon Valley RR. Co.* (1858), 30 Pa. 42.

Legislators as well as courts came to view the common-law rule as an obsolete impairment of beneficial corporate interests, or as negating the rights of the majority to exercise control over the corporate affairs to which ownership of their shares entitled them.[2] Ultimately, all states have provided by statute that unanimity is no longer a requisite to approval by the shareholders of such fundamental changes in the corporate structure as

---

[1] 12B Fletcher, Cyclopedia of the Law of Private Corporations (1984) 342, Section 5906.1; 2 Hornstein, Corporation Law & Practice (1959) 168, Section 629; Levy, Rights of Dissenting Shareholders to Appraisal and Payment (1930), 15 Cornell L.Q. 420; Lattin, Remedies of Dissenting Stockholders under Appraisal Statutes (1931), 45 Harv. L. Rev. 233, 236-237; Weiss, The Law of Take Out Mergers: A Historical Perspective (1981), 56 N.Y.U.L. Rev. 624, 624-628.

[2] See fn. 1, *supra*. See, also, Horwitz, The Transformation in the Conception of Property in American Law, 1780-1860 (1973), 40 U. Chi. L. Rev. 248; Hills, Consolidation of Corporations by Sale of Assets and Distribution of Shares (1931), 19 Calif. L. Rev. 349; Lattin, Equitable Limitations on Statutory or Charter Powers Given to Majority Stockholders (1932), 30 Mich. L. Rev. 645, 646; Comment, Statutory Merger and Consolidation of Corporations (1935), 45 Yale L. J. 105, 112-113; *Small* v. *Sullivan* (1927), 245 N.Y. 343, 357, 157 N.E. 261, 265 (Lehman, J., dissenting); *Alpren* v. *Consolidated Edison Co.* (Sup. Ct. 1938), 168 Misc. 381, 5 N.Y. Supp. 2d 254.

merger or sale of assets. See, *e.g.*, Note, Valuation of Dissenters' Stock Under Appraisal Statutes (1966), 79 Harv. L. Rev. 1453; Note, Corporation Law — Dissenting Stockholder's Right of Appraisal — Determination of Value (1953), 28 N.Y.U.L. Rev. 1021; Note, The Dissenting Shareholder's Appraisal Remedy (1977), 30 Okla. L. Rev. 629, 630.

To provide compensation for those shareholders who dissented from the merger, sale of assets, or change in structure decision by the majority, legislative enactments were made across the country. The nearly universal remedy, triggered in various ways, was to provide for an appraisal of the dissenting shareholders' stock, and for the corporation to purchase such stock at the appraised price. See statutes analyzed in Note, A Reconsideration of the Stock Market Exception to the Dissenting Shareholder's Right of Appraisal (1976), 74 Mich. L. Rev. 1023, fn. 2.

Some statutes provide that the court shall appoint a number of appraisers to determine the value of the dissenting shares, subject to limited review by the court and based upon the reasonableness of the appraisal report.[3] Other statutes provide that the trial court has discretion in the appointment of appraisers but must, after hearing all the evidence, inclusive of that of the experts, make its own determination of the value of the stock of the dissenting shareholders.[4] Ohio's statute contains this approach currently, although it should be noted that the predecessor section of law, G.C. 8623-72, provided for a mandatory appointment of appraisers. Furthermore, many jurisdictions, like Ohio, value the stock as of the day prior to the shareholders' vote approving the action. See, *e.g.*, Fla. Stat. Ann. Section 607.247(3) (1977); Mich. Comp. Laws Ann. Section 450.1768 (1987 Cum. Supp.); Pa. Stat. Ann. Title 15, Section 1515(B) (Purdon, 1987 Cum. Supp.).

A greater divergence of practice exists among states when the issue becomes one of ascertaining the value of the dissenters' shareholdings. This becomes obvious upon an initial perusal of the statutes themselves and their terms which describe the value to be ascertained. Some merely use the term "value,"[5] while others utilize "fair value,"[6] or "fair cash value."[7]

---

[3] See, *e.g.*, Nev. Rev. Stat. Section 78.510(1) (1986).

[4] See, *e.g.*, Ala. Code Title 10, Section 10-2A-163 (1975); Idaho Code Section 30-1-81 (1980); N.H. Rev. Stat. Ann. Section 293-A:82 (1986 Cum. Supp.); Vt. Stat. Ann. Title 11, Section 2004(e) (1984); Wis. Stat. Ann. Section 180.72(6) (1986 Supp.). See, also, Del. Code. Ann. Title 8, Section 262(c) (1983) (court hears exceptions to appraiser's report).

[5] See, *e.g.*, Del. Code Ann. Title 8, Section 262(f) (1983) (used interchangeably with "fair value"); Kan. Stat. Ann. Section 17-6712 (1986 Cum. Supp.).

[6] See, *e.g.*, Ala. Code Title 10, Section 10-2A-163 (1975); Fla. Stat. Ann. Section 607.247 (1977); Idaho Code Section 30-1-81 (1980); Ark. Stat. Ann. Section 64-707 (1980); Iowa Code Ann. Section 496A.78 (1962); Minn. Stat. Ann. Section 302A.473 (1985); Me. Rev. Stat. Ann. Title 13-A, Section 909(1) (1981); N.H. Rev. Stat. Ann. Section 293-A:82 (1986); Vt. Stat. Ann. Title 11, Section 2004(e) (1984); Wis. Stat. Ann. Section 180.72(6) (1986 Supp.); ALI-ABA Model Bus. Corp. Act Section 81 (1969); Rev. Model Business Corp. Act Section 13.01 (1984).

[7] See, *e.g.*, Nev. Rev. Stat. Section 78-510 (1986); R.C. 1701.85. See, also, Henn & Alexander, Corporations (3 Ed. 1983) 1002, Section 349.

Moreover, the statutes vary according to what is meant by such terms and the analytical approach required to obtain the final valuation for the stock. A number define their statutory term as referring to the stock market value,[8] when the stock is traded upon a national securities exchange[9] or, more specifically, traded upon the New York Stock Exchange. Otherwise, an appraisal is required.

Many states depend upon an appraisal proceeding, either by statute or through an alternative equitable proceeding. Such a proceeding attempts to ascertain the value of the dissenting shareholders' stock by analysis of: intrinsic value; net asset value; going concern value; liquidation value; net equity value; earnings value of the stock or dividends prospects; the nature of the enterprise and its relative position within the particular industry; post-merger gains or synergistic gain; tax benefits to all concerned; rescission and/or equitable concerns. A state may utilize all of the above factors, at least in theory, or some lesser combination of them.[10] Quite often courts rely upon three principal elements in arriving at the value of the shares of dissenting shareholders, *i.e.*, net asset value, market price of the stock on the New York

---

[8] See cases collected in Note, A Reconsideration of the Stock Market Exception to the Dissenting Shareholder's Right of Appraisal (1976), 74 Mich. L. Rev. 1023, 1024, fn. 4.

[9] In Section 80b-2(a), Title 15, U.S. Code, the term "national securities exchange" is defined as a securities exchange registered as a national securities exchange under the Securities Exchange Act of 1934. Any exchange may be registered with the Securities and Exchange Commission as a national securities exchange by filing a registration statement with the Commissioner. Section 78f(a), Title 15, U.S. Code.

Most stock-market exception statutes require that the stock be listed on a national securities exchange in order to invoke the exception. See, *e.g.*, Ariz. Rev. Stat. Ann. Section 10-080(C) (1977); Deering's Cal. Corp. Code Ann. Section 1300(b)(1) (1987 Supp.); Del. Code Ann. Title 8, Section 262(b) (1983); Fla. Stat. Ann. Section 607.244 (1987 Cum. Supp.); Ga. Code Ann. Section 22-1201 (1987 Cum. Supp.); Iowa Code Ann. Section 496A.77 (1987 Cum. Supp.); Kan. Stat. Ann. Section 17.6712(k) (1974); Md. Ann. Code, Corporations & Associations, Section 3-202(C) (1986 Cum. Supp.); Mich. Comp. Laws Ann. Section 450.1762 (1973); N. J. Stat. Ann. Section 14A:11-1 (1987 Cum. Supp.); R.I. Gen. Laws Ann. Section 7-1.1-73 (1985); Va.

Code Ann. Section 13.1-730(C) (1987 Cum. Supp.); Wis. Stat. Ann. Section 180.725 (1986 Supp.). Statutes in Maine and Tennessee state that the exception applies to stocks traded on " 'national securities exchange' as defined under the Securities Exchange Act of 1934, as amended" or "Registered with the Securities and Exchange Commission pursuant to section 12(g) of * * * the Securities Exchange Act of 1934." Me. Rev. Stat. Ann. Title 13-A, Section 908(4)(B) (1981); Tenn. Code Ann. Section 48-1-909(c) (1984). Instead of using "national securities exchange," Georgia, Pennsylvania and Utah specify the New York Stock Exchange or the American Stock Exchange, Ga. Code Ann. Section 22-1201 (1987 Cum. Supp.); Pa. Stat. Ann. Title 15, Section 1515(L) (Purdon, 1987 Cum. Supp.); Utah Code Ann. Section 16-10-75 (1987).

[10] See, *e.g.*, Coleman, Appraisal Remedy in Corporate Freeze-Outs: Questions of Valuation and Exclusivity (1984), 38 Sw. L. J. 775; Brudney & Chirelstein, Fair Shares in Corporate Mergers and Takeovers (1974), 88 Harv. L. Rev. 297; Brudney & Chirelstein, A Restatement of Corporate Freezeouts (1978), 87 Yale L. J. 1354; but, cf., Toms, Compensating Shareholders Frozen Out in Two-Step Mergers (1978), 78 Colum. L. Rev. 548, 552, fn. 12.

Stock Exchange and the earnings value (future) of the corporation. This method is commonly referred to as the "Delaware Block" analysis and allows a trial court to weigh each element by imposing a multiplier and then rendering an average value. See *In re General Realty & Utilities Corp.* (1947), 29 Del. Ch. 480, 52 A. 2d 6; *Weinberger* v. *UOP, Inc.* (Del. 1983), 457 A. 2d 701; Appraisal Remedy, *supra* (38 Sw. L. J.), at 779, fn. 10. All of these approaches to a determination of value of the shares of the dissenting shareholders may be appropriate under the specific requirements of a state statute, giving consideration to the salient facts surrounding a given corporate entity.

In determining the present case, we must look to Ohio's statutory procedures for determining the amount to be paid to dissenting shareholders. In the light of such statutes we shall analyze the specific circumstances of this corporate merger, including the point in time of such merger, and the evidence or indicia of the value of such stock which existed at that time. Also, we must look to this court's interpretation of such law, and any activity by the General Assembly in this specific area of the law.

The primary statute with which we are concerned is R.C. 1701.85. The predecessor section of law, G.C. 8623-72, provided, as does the current section, for the payment of the fair cash value to a shareholder for his shares as of the day prior to the vote of the shareholders. It also required, as does the current section, that any appreciation or depreciation in consequence of such action must be excluded from the determination of the fair cash value of the stock.[11]

---

[11] R.C. 1701.85 provides:

"(A)(1) A shareholder of a domestic corporation is entitled to relief as a dissenting shareholder in respect of the proposals in sections 1701.74, 1701.76, and 1701.84 of the Revised Code, only in compliance with this section.

"(2) If the proposal must be submitted to the shareholders of the corporation involved, the dissenting shareholder shall be a record holder of the shares of the corporation as to which he seeks relief as of the date fixed for the determination of shareholders entitled to notice of a meeting of the shareholders at which the proposal is to be submitted, and such shares shall not have been voted in favor of the proposal. Not later than ten days after the date on which the vote on such proposal was taken at the meeting of the shareholders, the shareholder shall deliver to the corporation a written demand for payment to him of the fair cash value of the shares as to which he seeks relief, stating his address, the number and class of such shares, and the amount claimed by him as the fair cash value of the shares.

"* * *

"(B) Unless the corporation and the dissenting shareholder shall have come to an agreement on the fair cash value per share of the shares as to which he seeks relief, the shareholder or the corporation, which in case of a merger or consolidation may be the surviving or the new corporation, within three months after the service of the demand by the shareholder, may file a complaint in the court of common pleas of the county in which the principal office of the corporation which issued such shares is located, or was located at the time when the proposal was adopted by the shareholders of the corporation, or, if the proposal was not required to be submitted to the shareholders, was approved by the directors. * * * On the day fixed for the hearing on the complaint or any adjournment of it, the court shall determine from the complaint and from such evidence as is submitted by either party whether the shareholder is entitled to be paid the fair cash value of any shares and, if so, the number and class of such shares. If the court finds that the shareholder is so entitled, the court may appoint one or more persons as appraisers to receive evidence and to recommend a deci-

The prior section of the General Code did not include a definition of "fair cash value." Accordingly, this court, in *Roessler* v. *Security Savings & Loan Co.* (1947), 147 Ohio St. 480, 34 O.O. 389, 72 N.E. 2d 259, defined the term in the first paragraph of the syllabus, as follows:

"The 'fair cash value' which a dissenting shareholder in a corporation is entitled to receive for his shares in a proceeding brought pursuant to Section 8623-72, General Code, is the *intrinsic value* of the shares determined from the assets and liabilities of such corporation, upon consideration of every factor bearing on value." (Emphasis added.)

This court, in *Roessler,* further found that the trial court had erred in instructing the appraisers that "fair cash value" meant a sum equal to that at which a willing buyer would purchase stock from a willing seller, *i.e.,* the "market value" of such stock. It was then determined that such instruction was prejudicial to the stockholder, in that market value may be less than the intrinsic value of the stock. Subsequently, and by what has been termed a response to *Roessler,* the General

Assembly enacted R.C. 1701.85(C), effective October 11, 1955 (126 Ohio Laws 432, 485), which provided for the definition of "fair cash value" as the willing seller-willing buyer test.

Significantly, the Comment of the Ohio State Bar Association Committee which recommended the addition of the definitions to this section, stated:

"*Division (C).* This division contains a frequently used definition of 'fair cash value.' This definition is one that is found in a great mass of judicial decisions both in Ohio and elsewhere, in litigation involving the value of property, in appropriation suits, tax controversies, and other legal proceedings in which property must be valued. It is believed that this definition will give the Bar a clearer test than that of 'intrinsic value' established by the Supreme Court in *Roessler* v. *Security Savings & Loan Co.,* 147 O.S. 480." 28 Ohio Bar 102 (Jan. 10, 1955).

Since the adoption of division (C) in R.C. 1701.85, this court has had no opportunity to discuss the meaning and application of the willing seller-willing buyer definition to the words "fair cash value" in the valuation of the

---

sion on the amount of the fair cash value. The appraisers have such power and authority as is specified in the order of their appointment. The court thereupon shall make a finding as to the fair cash value of a share, and shall render judgment against the corporation for the payment of it, with interest at such rate and from such date as the court considers equitable. * * *

"(C) If the proposal was required to be submitted to the shareholders of the corporation, fair cash value as to those shareholders shall be determined as of the day prior to that on which the vote by the shareholders was taken, and, in the case of a merger pursuant to section 1701.80 or 1701.801 of the Revised Code, fair cash value as to shareholders of a constituent

subsidiary corporation shall be determined as of the day before the adoption of the agreement of merger by the directors of the particular subsidiary corporation. The fair cash value of a share for the purposes of this section is the amount that a willing seller, under no compulsion to sell, would be willing to accept, and that a willing buyer, under no compulsion to purchase, would be willing to pay, but in no event shall the fair cash value exceed the amount specified in the demand of the particular shareholder. In computing such fair cash value, any appreciation or depreciation in market value resulting from the proposal submitted to the directors or to the shareholders shall be excluded."

shares of dissenting shareholders.[12] However, a number of Ohio cases in the courts of appeals involved the interpretation of such words within R.C. 1701.85. The Court of Appeals for Franklin County considered the meaning of such terms in *Vought* v. *Republic-Franklin Ins. Co.* (1962), 117 Ohio App. 389, 24 O.O. 2d 168, 192 N.E. 2d 332. That court determined the manner by which, under the new definition, the dissenter's stock should be valued. The case apparently involved an appraisal of shares held by the dissenting shareholders of Republic-Franklin Insurance Company, which company's stock was not being traded upon any stock exchange. The dissenting shareholders in *Vought* argued that the willing buyer-willing seller standard may not apply where there are no market transactions from which to gain this data. In such an instance, they argued, the standard of valuation would be the "intrinsic value."

The court, however, held that the adoption of R.C. 1701.85, including its definition of fair cash value, "was a legislative overruling of the holding of the *Roessler* case by a deliberate adoption of the hypothetical market value standard, and that *standard* is applicable to the valuation of shares held by dissenting shareholders regardless of the existence or nonexistence of comparable sales in a suitable existing actual market." *Id.* at 391, 24 O.O. 2d at 169, 192 N.E. 2d at 334. "Such a standard generally will permit evidence to be introduced as to any factor which a reasonable man would take into consideration in determining value. Actual market conditions are, therefore, open to proper interpretive

evidence." *Id.* at 391, 24 O.O. 2d at 169, 192 N.E. 2d at 333.

In *Vought* the court pointedly set forth its recognition of the appropriate factors to be considered in other situations where the active market trading of the shares of the corporation was involved. The court stated that: "[u]nder some conditions certain types of evidence may be so persuasive as to be entitled to a legally preferred status, and other evidence could become too speculative. If a sufficient actual market existed for identical items, in which active trading was occurring, such evidence might be controlling, and other methods of evidencing value (for example, original cost or capitalization of earnings) may be excludable. This point would probably be true in most cases involving the valuation of stock which is actively traded on the New York Stock Exchange." *Id.*

Following the *Vought* case, the same court of appeals had further occasion to discuss and interpret the language of R.C. 1701.85(C) in *Parten* v. *Pure Oil Co.* (July 1, 1969), Franklin App. No. 9023, unreported. The author of the opinion in the case *sub judice* was also the author of the *Parten* opinion. In *Parten,* the court stated: "We hereby adopt and apply this philosophy as set forth in the *Vought* case to the cause before this court.

"As reasonably stated in *Vought,* 'in the absence of a suitable actual market, valuation is difficult and the evidentiary problem can become very complex.' However, where there is in fact a presence of such suitable actual market for the identical stock to be appraised, such evidence should be controlling.

"If the actual market is deemed

[12] At present, Ohio, together with a small but growing minority of other states, defines the value of a share by the willing buyer-willing seller test. Obviously, market price of the stock is the focus of such valuation. See, *e.g.,* Ga. Code Ann. Sections 22-1201 and 1202.

to be sufficiently active in its trading of the particular stock in question, then, giving substantial weight to such factor does no violence to the willing seller, willing buyer (hypothetical market) theory.

"Such actual market price would in fact be the willing seller, willing buyer amount dictated by the statute. From such amount, of course, there must be excluded either appreciation *or* depreciation, if either is found to be present as a result of *the* proposal acted upon by the shareholders." *Id.* at 17.

In *Parten,* on a review of the evidence that had been before the appraisers and the trial court, the appellate court held that there was "a sufficiency of activity in the market for Pure [Oil] shares, and that the time relationship of such activities on the New York Stock Exchange on the date in question of July 1, 1965, constituted a sufficient market in which such trade was in fact occurring." *Id.* The court stated that "the evidence of the actual market price as to be found upon the Stock Exchange, should have been so persuasive as to be given a preferred status over the other information and data related to asset value, going concern value, etc., in determining the 'willing seller, willing buyer' fair cash value of such stock on the appraisal date as provided by the statute." *Id.* at 21.

There are several rationales which support the analyses set forth in *Vought* and *Parten, supra.* Generally, modern shareholders do not purchase stock as entrepreneurs who closely scrutinize or take an interest in corporate operations, but instead seek assured incomes and long-term appreciation of their investment.[13] As one commentator has stated: "[I]n substantially every case other than [those] related to control, the owner of shares of a company listed on a national securities exchange *regards himself as an investor in those securities, rather than as a part [owner] of the corporate enterprise.* The investor's objective is not to promote the income of the corporation *but to enhance his distributive share,* not to increase the corporate assets but to enhance the value of his securities. *Since the measurement of these objectives is provided by the exchanges . . .* dissent and appraisal no longer [should be] required."[14] (Emphasis added.) Moreover, the purchaser of shares makes, at most, only a limited commitment to the kind of large corporation that has widely traded stock. The usual investor has never sought the assets of the corporation or access to control of its operations. It is therefore most unreasonable to attempt to value a share of stock, held by a dissenting shareholder, utilizing valuation techniques oriented upon inner-corporate functions and property holdings of which the shareholder had little if any knowledge at the time he purchased the stock.

Nor can we fail to notice that the kind of appraisal procedures which utilize the various aforementioned approaches to valuation are most expensive. Such approaches invariably create the spectacle of considerable sums being spent to haul thousands of

---

[13] See, *e.g.,* Hurst, The Legitimacy of the Business Corporation in the Law of the United States 1780-1970 (1970).

[14] See fn. 8, *supra,* Note, at 1029, quoting Scott, Changes in the Model Business Corporation Act (1968), 24 Bus. Lawyer 291, 303. Also, business decisions are more often unaffected by the desires of shareholders. See, *e.g.,* 2 Davis, Corporations (1961) 272-274.

documents and numerous, but often contradictory, expert opinions into court to be analyzed by a trial judge who may have only a limited frame of reference in such matters. Furthermore, many of such documents are internal and/or of a confidential nature, as in the record before us, revealing ordinarily hidden assets and valuations. As previously mentioned, such knowledge was largely unknown to the shareholder at the time he purchased his stock. Consequently, it formed little or no part of his decision to purchase the stock or, indeed, to dissent from the tender offer and merger. On the other hand, a great number of studies have shown that stock exchanges, such as the New York Stock Exchange, have a reasonably efficient market,[15] meaning that the market price of a share will ordinarily fluctuate in random fashion within a range quite near the actual value of the stock.[16]

By utilizing the stock market price as the beginning point of analysis in cases such as those before us now, a great many advantages will result to shareholders and corporations alike. One obvious benefit is that the scope of analysis is fairly narrowed such that the parties may, to a reasonable degree, predict the outcome of the proceedings. Pre-appraisal settlement then becomes the better alternative to litigation. The harassment potential inherent within an appraisal remedy as well as vexatious lawsuits (by those whose real goal is simply to receive more money for their stock) will, under the within clarified standard, become much more unlikely. Further, costs to all shareholders will be ultimately reduced by this more straightforward proceeding.

The dissenting shareholder will bear fewer costs to exercise his legal rights since the scope of discovery and concomitant courtroom presentations will be lessened. Also, the costs to the majority shareholders will decrease since less corporate funds will go toward participation in the appraisal

---

[15] See, e.g., Ball & Brown, An Empirical Evaluation of Accounting Income Numbers (1968), 6 J. of Acc. Res. 159 (found that most information contained in annual earnings announcements is anticipated by the market before the actual report is released); Crouch, A Nonlinear Test of the Random-Walk Hypothesis (1970), 60 Am. Econ. Rev. 199 (serial correlation tested five NYSE stocks for special conditions and found independence in pricing); Fama & Blume, Filter Rules and Stock Market Trading (1966), 39 J. of Bus. 226 (application of filter rules to the DJIA stocks found independence in price behavior); Fama, Fisher, Jensen & Roll, The Adjustment of Stock Prices to New Information (1969), 10 Intl. Econ. Rev. 1 (study of stock splits on the NYSE supports efficiency theory since the market makes an unbiased forecast of the implications of the split for future dividends); Granger & Morgenstern, Spectral Analysis of New York Stock Market Prices (1963), 16 Kyklos 1 (use of spectral analysis found independence in prices in stocks in Standard & Poor's Industrial Index), discussed in Baumol, The Stock Market and Economic Efficiency (1965) 40-41; Mandelker, Risk and Return: The Case of Merging Firms (1974), 1 J. of Finan. Econ. 303 (market discounts news of merger many months in advance); Scholes, The Market for Securities: Substitution versus Price Pressure and the Effects of Information on Share Prices (1972), 45 J. of Bus. 179 (study of secondary distributions found that market anticipates information implicit in the offering).

[16] See, e.g., Cootner, The Random Character of Stock Market Prices (2 Rev. Ed. 1967); Mandelbrot, Forecasts of Future Prices, Unbiased Markets, and "Martingale" Models (1966), 39 J. of Bus. 242; Lorie & Hamilton, The Stock Market: Theories & Evidence (1973) 75-80.

proceeding. Finally, a less complicated valuation proceeding will advance the goal of streamlining corporate reorganizations and, at the same time, protect the liquidity and value of the dissenting shareholder's stock.

Having established the accuracy and desirability of the stock market price as an initial value in cases such as the one before us, it must now also be pointed out that the statute requires that any effects of the subject transaction which are caused by either appreciation or depreciation of the market price must be removed from such price.[17] Admittedly, merely adopting the market price established by the trading activity on the day before the vote to initiate the merger may not suffice to fully eliminate such effects.[18] However, Ohio's statutory mandate is sufficiently broad to allow inquiry into such factors as may have created a price disparity. The valuation remedy clearly is a remedy that does not give dissenting shareholders any element of value attributable to the transaction from which they have dissented. On the other hand, any factors relating to the merger which have artificially depressed the stock's price ought not to create a windfall for the tenderer at the expense of the dissenter.

Certainly prices of the stock which prevailed before the market began to adjust for the impending merger would constitute valuable evidence. This approach is currently utilized in prosecutions under Rule 10b-5 (Section 240.10b-5, Title 17, C.F.R.) (fraud on the market) where the fraudulent transaction is measured by the difference between the market price paid for the shares fraudulently obtained and that market price adjusted for the appreciation or depreciation created by the fraudulent practice. Moreover, such prosecutions presume not only that the market efficiently incorporates information into the price but also that the price otherwise reflects value. See, e.g., Blackie v. Barrack (C.A. 9, 1975), 524 F. 2d 891, certiorari denied (1976), 429 U.S. 816; Jennings & Marsh, Securities Regulation: Cases and Materials (1982) 1186.

Based upon the foregoing, we believe that the applicable law stated within Parten v. Pure Oil Co. may be applied here. Furthermore, the later amendments to the dissenting shareholder statute, R.C. 1701.85, particularly the addition of the terms, willing buyer-willing seller, permit the dissenting shareholders to elect to receive, in lieu of the tender consideration, that amount which their shares would have brought on the market at the time of the merger, had the transaction dissented from never occurred.

The evidence adduced at the trial herein showed that there was considerable trading of Marathon stock on the New York Stock Exchange. The record before us indicates that from November 2, 1981 until March 10, 1982, the date of the shareholders' vote, 35,211,100 shares of Marathon stock had been traded on the Exchange. The trial court noted in its opinion that "[i]f we consider that Marathon had 56,689,306 shares outstanding on March 10, 1982, 62.112% of such shares [was] traded." Concerning the sale price of the Marathon stock during this period, the

---

[17] R.C. 1701.85(C) provides, in pertinent part, that:

"In computing such fair cash value, any appreciation or depreciation in market value resulting from the proposal * * * shall be excluded."

[18] See, e.g., Mandelker, Risk and Return: The Case of Merging Firms (1974), 1 J. of Finan. Econ. 303.

court noted that: "The high during that period was 108-1/8 and the low was 70-3/4." The stock actually closed at 75-3/4 on March 10, 1982.

The trial court, in viewing the market activity of the Marathon stock upon the Exchange, concluded that R.C. 1701.85, and the case law available, would require it to give due emphasis, if not controlling emphasis, to the market price rather than to a theoretical market value based upon an analysis of various factors including the assets of the corporation. The court of appeals rejected the trial court's analysis on this point. It held that: "[W]hat is to be valued is not the value of a single share if it were to be sold in an isolated sale, but instead the value per share of all the shares of the corporation, which can be determined only upon the basis of a hypothetical market or sale of all the shares of the corporation."

We conclude that the court of appeals mistakenly viewed the intent and meaning of the words of the statute as well as the holdings of both *Vought* and *Parten.* The view that fair cash value must be determined by calculating a pro-rata share of a constructed or hypothetical purchase price for the entire corporation where there is an actual market for the stock of the company particularly when the stock is actively traded is simply incorrect.

As held in *Vought,* and emphasized in *Parten,* the Ohio statute provides for the willing seller-willing buyer standard, which is the market value definition. It should be applied whenever the indicia of significant market trading is manifest. Also, evidence of such market activity and price should be of greatest significance and weight.

The statutory scheme of R.C. 1701.85 was established to enable courts and their advising appraisers to determine not only the value of actively traded stock, as in the case *sub judice,* but also the value of closely held stock in privately or closely held corporations, which stock has little, or no, over-the-counter trading activity. In the latter instances, the trial court and the appraisers would have no analysis of market activity to apply. Under such circumstances, they may well apply the so-called hypothetical market valuations to the dissenters' shares. In so doing, the court may utilize all acceptable accounting principles including asset value, capitalization of earnings, dividend returns, management, potential growth of corporate endeavor or product, as well as other acceptable criteria. However, where a reasonably sufficient actual market does exist, there is no need to construct a hypothetical market.

As noted, the court of appeals held that the fair cash value must be determined upon the basis of a sale of "all or substantially all" of the shares of the corporation, not just upon the determination of value of "a single share" of the corporation. We believe this to be incorrect. As the court in *Parten* noted, "[t]he statute requires that the appraisal of the fair cash value be for *a* share of the stock appraised." (Emphasis *sic.*) *Id.* at 20. The relief being sought by the dissenting shareholder is "payment to him of the fair cash value of the shares as to which he seeks relief. * * *" R.C. 1701.85(A)(2). It is therefore readily apparent, from the wording of the statute itself, that the determination of value to be made is of the value of those shares held by the dissenting shareholders who opted not to join with the other shareholders in approving the corporate action of merger or other basic structural change. There is no reason to consider, nor is the dissenting shareholder entitled to receive, any of the premium

value offered as consideration to those who in fact tendered their shares.

We determined that, in applying its "all, or substantially all" approach to determine fair cash value of the dissenting shareholders, the court of appeals also improperly considered the $125 per share offered by U.S. Steel in the mid-November tender offer which was for fifty-one percent of Marathon's stock. This amount must reasonably be considered as a premium offer, made to enable U.S. Steel to acquire the controlling stock in Marathon. Further, by its terms, this premium offer was to be apportioned only among the accepting shareholders and was not to pertain to the other shareholders. We now hold that where there is considerable stock market indicia upon which to rely for the determination of fair cash value, the amount tendered to obtain the controlling interest of the corporation is not properly includable in the determination.[19] Thus, as the Supreme Court of Oklahoma noted in *Foglesong* v. *Thurston Natl. Life Ins. Co.* (Okla. 1976), 555 P. 2d 606, 611: "The purchase of stock to gain controlling interests is not properly includable in determining the market value of the shares of stock, and the court may take judicial notice of the fact that acquisition of stock to acquire control is frequently made at premium prices." (Footnote omitted.) See, also, *In re Valuation of Common Stock of Libby, McNeill & Libby* (Me. 1979), 406 A. 2d 54, 58, fn. 3 (noting that tender offers frequently, if not usually, involve premiums in excess of current market price); *Gibbons* v. *Schenley Industries, Inc.* (Del. Ch. 1975), 339 A. 2d 460, 468 (based upon the statutory proceeding).

In determining the "fair cash value" of shares held by dissenting shareholders under R.C. 1701.85, the inquiry should first focus upon the degree of sales activity of such stock upon the major exchanges, then the activity if any upon the smaller exchanges, or over-the-counter sales. If there is found to be significant activity upon any of these markets, then a court should focus upon the subject stock's trading activity as a benchmark for the willing seller-willing buyer standard. It is our belief that the legislative amendments intended that where market activity is significant, that market's price should be utilized. With proper adjustments for the impact of the proposed transaction dissented from, such market price will allow the dissenter to exit the market in basically the same manner, and by the same terms, as he entered.

As to the adjustments to the market price to accommodate any appreciation or depreciation present in that price because of the pendency of the proposed merger, as required by R.C. 1701.85(C), the trial court found that its determination of "fair cash value does not include any 'appreciation,' which is to say, enhancement of the value of Marathon stock. * * *" Marathon argues here that the correct applicable valuation date was March 10, 1982, and that although the stock market value of a Marathon share of stock on this date was $75.75, there was significant evidence that the price was appreciated due to the U.S. Steel merger offer.

The record shows that from January 1, 1981 to October 29, 1981, Marathon's stock price had, in what one witness termed "a horrendous

---

[19] See Easterbrook & Fischel, Corporate Control Transactions (1982), 91 Yale L. J. 698, 708-711; Toms, *supra* (78 Colum. L. Rev. 548), at 556 (tender offer bid is product of bargaining); Henry, Activities of Arbitrageurs in Tender Offers (1971), 119 U. Pa. L. Rev. 466, 469 (risk that merger may fail is borne by arbitrageur).

bear market," a range from a low of $46.125 on May 26, 1981 to a high of $79.75 on August 13, 1981. Moreover, the average price over the same period was some $60 per share. On October 29, 1981, Marathon stock closed at $63.75 on a volume of 369,100 shares. Mobil submitted the tender offer to purchase up to sixty-seven percent of Marathon stock for $85 per share on October 30, 1981. Marathon stock traded on the Exchange at $90 on November 2, 1981. The price then ranged downward until it reached $77 per share on November 18, 1981, which was the date U.S. Steel made its offer. The stock went up following such offer to $104.25 on November 19, 1981. It stayed at a little over $100 until December 12, 1981 when the stock began to decline to the mid $70s. The closing price, as stated, on March 10, 1982, was at $75.75.

The mandate of R.C. 1701.85 is that any appreciation or depreciation in market value resulting from the proposal submitted to the directors or to the shareholders shall be excluded. The above review of the average of the stock market prices of Marathon stock between the date of the U.S. Steel proposal and the date of the shareholders' vote, i.e., between November 18, 1981 and March 10, 1982, would indicate that there had not been significant appreciation in such prices. Any fluctuation was apparently due to normal willing seller-willing buyer activity. The trial court so found and denied any appreciation factor in its fair cash price determination.

However, as stated, Marathon argues that there was a demonstrated appreciation of the stock here, which should be factored in by the trial court. Marathon argues that the opportunity and prospect of Marathon stock purchasers' receiving a note, then valued at slightly more than $76, for each share of their stock, caused the market price of Marathon's shares to stay near that level. Data offered by Marathon's expert witnesses showed that Marathon's stock, absent the merger offer, would have returned to the range of other comparable oil producing corporations which, it was shown, declined in price by approximately thirty percent in that same period. It was testified that, absent the prospect of exchanging stock for notes, Marathon's stock would have fallen below $50 per share, being adjusted to reflect the market and company outlook during the period of October 1981 to March 10, 1982.

Based upon all of the evidence presented, we hold that the trial court should have first established the correct date for the valuation of the stock, i.e., March 10, 1982. Second, all factors concerned with, or reasonably affecting, any appreciation of the stock should have been reviewed and decided by the trial court. Accordingly, this matter is reversed and the cause is remanded to the trial court for the limited determination of what appreciation or depreciation, if any, existed due to the U.S. Steel proposal submitted to the Marathon shareholders.

II

As previously mentioned, appellee, Frances A. Armstrong, made demand for fair cash value upon Marathon in her own name and also in the individual names of various members of the Marathon Shareholders Committee. She signed the demand letters as attorney in fact and delivered them on March 22, 1982. The demand letters so executed were filed within the ten-day period prescribed by R.C. 1701.85(A) (2) which, in pertinent part, requires that: "Not later than ten days after the date on which the vote on such proposal was taken * * *, the shareholder shall deliver to the corporation a writ-

ten demand for payment to him of the fair cash value of the shares as to which he seeks relief * * *." Approximately three weeks later, Armstrong provided evidence of her power of attorney to act for the above shareholders.

Prior to trial, Marathon moved for summary judgment against the above shareholders asserting that their demand letters were untimely because no proof of the existence of Armstrong's power of attorney was provided until after the ten-day limitation had expired. The trial court agreed, upon authority of Klein v. United Theaters Co. (1947), 148 Ohio St. 306, 35 O.O. 298, 74 N.E. 2d 319, and its third syllabus paragraph which states, in pertinent part, that a shareholder has failed to comply with the statutory demand requirements if he "did not personally make an objection in writing to the corporation and demand the fair cash value of his shares, and the only written objection and demand on behalf of the shareholder was made by an agent who was a stranger to the corporation and furnished no proof of his authority or agency, although the shareholder did not vote in favor of the sale." (Emphasis added.) Also, it was stated in Klein "that such written authority must be displayed to or filed with the corporation within the time limited." Id. at 324, 35 O.O. at 305, 74 N.E. 2d at 327.

The court of appeals determined that neither the statute nor the language of Klein required proof of a power of attorney to be presented or displayed to the corporation within the ten-day period. Although we hold that the principles of law as set forth in Klein are valid, generally requiring that proof of an agency relationship be submitted within the ten-day period, we nevertheless conclude that where the agent is not a stranger to the corporation, such principles may not be applicable. In this regard, there are several factual distinctions between the case here and Klein. Furthermore, because there are several rationales underlying Klein which are not applicable to the case sub judice, we find that Klein is not determinative of this case.

As previously mentioned, and also as pointed out in Klein, at common law a single shareholder could, by his vote, entirely block a merger or liquidation of assets. Id. at 317, 35 O.O. at 303, 74 N.E. 2d at 324-325. Ordinarily, it is the rule that statutes in derogation of the common law are to be strictly construed. This rule would more properly apply to the statutory provisions which strip the shareholder of his power to block the transaction, and not those which, by way of exchange, grant him the right to cash out his stock at a fair price. Of course, very little is to be gained by strictly construing the statute against the dissenting shareholders especially since, in the historical development of corporations, prior law allowed individual shareholders to exercise more power. Therefore, those provisions which regulate the powers of shareholders need only be as strictly construed as modern economic necessity would dictate and/or the General Assembly might specifically require.

Admittedly, the use of a proxy by an agent of the shareholder is in derogation of the common law since "[t]he right to vote at meetings [formerly could not] be delegated." Id. at 319, 35 O.O. at 303, 74 N.E. 2d at 325. Currently, however, the right to utilize the services of an agent to vote one's shares or otherwise exercise the power of a shareholder is granted by R.C. 1701.48(A) which provides in pertinent part that shareholders "may be represented at [a shareholders'] meet-

ing or vote thereat, and execute consents, waivers, and releases, and *exercise any of his other rights,* by proxy or proxies appointed by a writing signed by such person." (Emphasis added.)

The only relevant portion of this statute amenable to a strict construction is the manner in which such agency relationship is to be established, *i.e.,* by an executed writing granting such power as is intended, and also, by direct inference, that such writing be executed before the exercise of the power conferred. This, of course, was quite correctly determined in *Klein, supra,* at 324, 35 O.O. at 305, 74 N.E. 2d at 327. On the other hand, the issue of *when* such authority ought to be displayed to the corporation is not comprehended by the statute and, thus, should not be subjected to a strict statutory or other construction. Whether the exercise of power granted ought to be narrowly or broadly viewed regarding the timing issue is properly determined from the necessities and practicalities of corporate legal circumstances.

An example of when the power of attorney or proxy should be displayed prior to its exercise is demonstrated by those circumstances and legal implications of voting the shares of stock. For quite obvious reasons, voting of stock must be done only by those who are the owners of such stock or their designated agents. Shareholder voting directs and controls basic corporate policy. The vote determines who will have the responsibility of conducting the business affairs of the corporate entity. Consequently, the identity of shareholders or their designated agents must be ascertained at the time of, or prior to, shareholder discussions or voting. And so it is that, ordinarily, without presently demonstrable authority to act on behalf of one who holds stock, an alleged agent may not

exercise any right, privilege, or power of a shareholder in such matters. Indeed, the agent's very admittance to shareholder meetings may be conditioned upon presentation of proof of such authority, which safeguards against outside interference into corporate matters.

A demand for fair cash value is, however, quite distinct from voting the shares, both as to the legal consequences of the act itself as well as to the pronounced lack of circumstances surrounding the act which might give rise to a necessary advance proof of written authority to act. The demand for fair cash value is not the exercise of a voting right. In fact, under R.C. 1701.85(A), the vote for merger must already have occurred before the right to make demand for appraisal arises. The legal effect of such demand is that the shareholder may no longer have any voice in the corporation's policy determinations. R.C. 1701.85(E) provides that from the time of demand notice, all of the shareholders' rights to vote the shares (supposing that the class of stock enjoys voting rights), rights to dividends, as well as all other rights arising from stock ownership "are suspended." Also, upon request of the corporation, such shares must be physically surrendered upon demand in order that the corporation may "endorse on them a legend to the effect that demand for fair cash value of such shares has been made." R.C. 1701.85 (A)(5). This may be required because "after the demand, they are not 'good delivery' as shares, since they then represent merely an unliquidated monetary claim against the corporation." Committee Comment to R.C. 1701.85. Thus, rather than being the exercise of shareholder power, such demand instead functions as an abdication of rights and interests in the corporation.

As a practical matter, the demand

serves only a notice purpose that the shareholder prefers to sever his connection with the corporation. As previously mentioned, the dissenting shareholder who makes a demand for fair cash value will in all probability have *already* unsuccessfully voted against a merger. See R.C. 1701.85 (A). Such dissent, and probability of demand for fair cash value, are therefore already manifested by the dissenting vote. Also the demand is a further expression of dissatisfaction and seeks compensation for the dissenting shareholder. Accordingly, there is no then-present urgency to ensure, with absolute accuracy, that only those qualified to make demand are, in fact, doing so.[20]

Despite the inapplicability of portions of the *Klein* case to the one before us, we nevertheless continue to adhere to our view that a stranger to the corporation must provide proof of his authority to act prior to any exercise thereof. There is present both urgency as well as concerns of vital importance when, as correctly determined in *Klein,* the one claiming power to act as agent is a stranger to the corporation. *Klein, supra,* at 322, 35 O.O. at 304, 74 N.E. 2d at 326. Such persons are third parties to the relationship between corporation and shareholder.

The corporation has no obligation to, or authority over, one in such position, absent proof of authority to act. His announcement of demand for fair cash value is attended with the taint of suspicion that he acts on his own. It is, therefore, only reasonable that the corporation not be required to presume his authority upon his mere announcement of it.

However, the shareholder who acts for other shareholders should not be held to such a standard. He is a fully interested party to the proceedings and is himself usually in harmony with those shareholders whom he represents. Moreover, his rights in making his own demand flow from his personal ownership of stock. The nature of his position, we feel, is of sufficient proximity to entitle him to a reasonable presumption that he possesses the claimed written authority. The corporation may, of course, insist upon viewing evidence of such written authority. However, prior to such demand, there is no requirement that a shareholder who makes demand for fair cash value for himself and other shareholders be required to provide evidence of his authority within the time limits imposed by R.C. 1701.85(A), so long as such authority in fact exists in writing at the time, and

---

[20] *Klein, supra,* made considerable reliance upon the rationales underlying the Delaware cases, *In re Universal Pictures Co.* (1944), 28 Del. Ch. 72, 37 A. 2d 615, and *Friedman* v. *Booth Fisheries Corp.* (1944), 28 Del. Ch. 211, 39 A. 2d 761. Their persuasiveness and applicability to the Ohio statute generally, and the case *sub judice* in particular, are greatly undercut by the fact that the Delaware corporate law upon which these cases were decided required a dissenting shareholder to inform the corporation *prior to the merger vote* of his intent to dissent, and demand an appraisal. It was this demand notice to which their ra-

tionales were applicable. See, *e.g., Zeeb* v. *Atlas Powder Co.* (1952), 32 Del. Ch. 486, 492, 87 A. 2d 123, 125-126. Consequently, it would be of vital importance to ensure that the dissenter's agent is *bona fide* prior to his exercise of delegated rights. The requirement of prior proof of authority flowed from obvious concerns of fraudulent attempts to influence the merger vote to follow and, as such, was not unlike any other use of a proxy to vote shares. See, *e.g., Zeeb, supra,* at 492, 87 A. 2d at 126; accord *Raab* v. *Villager Industries, Inc.* (Del. Ch. 1976), 355 A. 2d 888.

is later submitted to the corporation within a reasonable time.

In conclusion upon this issue, it is quite apparent that *Klein* is distinguishable from the present case. Not only was the agent in *Klein* a stranger to the corporation, but he possessed no written authority to act at the time he did so. In the case here, Armstrong was herself a shareholder, and no stranger to the corporation. Not only did the required written authority exist prior to her exercise thereof, but she also possessed such authority. Moreover, she delivered proof of her authority within a reasonable time following the filing of demand, and did not, as in *Klein*, merely execute powers of attorney on the eve of litigation. We therefore affirm the decision of the court of appeals as to this issue.

### III

Lillian Werk Price, Trustee (hereinafter "Price Trust") sought a determination as to fair cash value of those shares held in trust. During the initial stage of the proceedings, which was specifically devoted to a determination of which shareholders would be eligible to participate in the later determination of fair cash value, the trial court sustained a motion for summary judgment by Marathon Oil against Price Trust. By its entry of final judgment of February 8, 1983, the trial court ordered Price Trust dismissed from the case with prejudice, which order was timely appealed to the Court of Appeals for Hancock County.

Thereafter, the remaining parties to the statutory proceeding entered into the trial preparation stage. This involved extensive discovery among the remaining parties, including interrogatories and depositions. The discovery ultimately resulted in an exchange of fifteen to twenty thousand documents. The final pretrial conference was scheduled for September 14, 1983 with trial to begin on October 3, 1983.

On September 6, 1983, the court of appeals reversed the decision of the trial court and remanded the Price Trust claim for determination of the fair cash value of Price Trust's shares. On September 8, 1983, Price Trust moved for a continuance of thirty days as to both the pretrial conference and the trial date. The trial court denied the motion on the very day it was made, as it also did for the September 14, 1983 motion for reconsideration. On September 15, 1983, Price Trust requested a continuance of six months which was again denied on that same day. Price Trust ultimately appealed this issue, following trial, to the court of appeals which held that the trial court abused its discretion by denying a continuance. Marathon has appealed such decision to this court, arguing that the trial court's decision was within its sound discretion. We now affirm the determination of the court of appeals in part and modify in part.

It is uncontested that Price Trust did not participate in any discovery from the time of dismissal until such error was corrected by the court of appeals. This was, of course, the major reason that a continuance was sought. It is also undisputed that Marathon's right to appeal the decision of the court of appeals to the Ohio Supreme Court had not lapsed. Further, the chief counsel for Price Trust was out of town, due to a family death, from September 6, 1983, which was the day the decision of the court of appeals was released, until approximately September 12, 1983.

Against the above excellent grounds for granting a continuance, none of which were contrived, dilatory, or resulted from any act of Price

Trust, Marathon asserts that the trial court had extended to Price Trust's counsel an invitation to continue discovery pending appeal. Such claim is based upon correspondence from Judge Walker to Price Trust's counsel which stated: "I am enclosing herewith a copy of the entry setting up the pretrial conference in the Marathon cases for February 22, 1983.

"I understand that each of you [is] appealing certain rulings of the Court and that the Court of Appeals has not ruled in any of these cases but you are each welcome to attend. *Your participation will be governed by the Court,* however, you have *every right to confer* with all other counsel." (Emphasis added.)

It is Marathon's contention that Price Trust made "a conscious tactical decision, in the face of an approaching trial date, not to participate in the discovery proceedings." This, it is asserted, was part of a deliberate risk which Price Trust took "that if the appeal were successful, Price would be facing a trial date in October of 1983. * * *"

It appears that both Marathon and the trial court have overbroadened the scope and degree of power available to trial courts in circumstances such as those before us. One who, as Price Trust, is dismissed with prejudice from a consolidated action before the trial court no longer has any standing to pursue discovery. Also, it is a contradiction to dismiss a party's claim, on its merits, and yet attempt to provide continued "participation" during the pendency of the appeal. Moreover, a trial court may not order any remaining parties, such as Marathon, to comply with discovery requests presented by one who is no longer a party to the action. Final judgment by the trial court brings to an end its jurisdiction over the party whose claim is so adjudicated.

Upon remand from the court of appeals, Price Trust was entitled to a reasonable discovery period prior to trial. It is basic law that an "action of the Court of Appeals in reversing the cause and remanding the case to the Court of Common Pleas for further proceedings has the effect of reinstating the cause to the Court of Common Pleas *in statu quo ante.* The cause is reinstated on the docket of the court below in precisely the same condition that obtained before the action that resulted in the appeal and reversal." (Emphasis added.) 5 Ohio Jurisprudence 3d (1978) 426, Appellate Review, Section 717. Furthermore, this court has specifically held that upon remand from an appellate court the lower court is required to proceed from the point at which the error occurred. *State, ex rel. Stevenson,* v. *Murray* (1982), 69 Ohio St. 2d 112, 113, 23 O.O. 3d 160, 431 N.E. 2d 324, 325. In the case *sub judice,* Price Trust was ruled ineligible to proceed at what was a preliminary stage in the proceedings. Upon remand, it therefore should have been permitted to continue the presentation of its case from its last procedural position prior to dismissal. This would have entitled Price Trust to a reasonable discovery period to prepare its case. Specifically, the correct procedure here would have been to continue all of the cases for a reasonable period of time.

Price Trust's claim had been consolidated with the claims of the other dissenting shareholders into a single action for fair cash value of their shares. Based upon the statutory command to determine "the fair cash value of *a share*" (emphasis added), it may be concluded that the intent of the General Assembly was that a single determination under R.C. 1701.85 be conducted and not multiple proceedings upon the same issue, with various potential outcomes. Had Price Trust

sought a continuance for itself alone, or, had the trial court ordered such, neither of which occurred in the case here, then Price Trust would have had to overcome both collateral estoppel and statutory barriers to a later proceeding.

We therefore affirm the determination of the court of appeals that the trial court erred in this regard. However, from the time of the denial of the motions for continuance Price Trust has received considerable documentation, including fifteen to twenty thousand documents six days before trial. It has since had considerable time in which to make its evaluation of such material as well as the testimony of the expert witnesses. Also, the issues, pursuant to our determination of the first (valuation) issue above, have been considerably narrowed, and are resolvable without recourse to a further evidentiary hearing. Nevertheless, Price Trust may, if it so chooses, engage in a limited discovery upon those issues yet to be determined and may present any new evidence upon such issues as has not already been placed within the record.

## IV

Appellant Harrell asserts that the trial court's refusal to grant a jury trial upon the issue of fair cash value was violative of Section 5, Article I of the Ohio Constitution, which states, in pertinent part: "The right of trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury." Appellant also points to R.C. 2311.04 which provides that: "* * * Issues of fact arising in actions for the recovery of money only, * * * shall be tried by a jury * * *." The scope of such statute is certainly no greater than the constitutional provision.

In contrast to appellant's claim, R.C. 1701.85(B) provides that: "*The court* thereupon shall make a finding as to the fair cash value of a share, and shall render judgment against the corporation for the payment of it * * *." (Emphasis added.) Quite clearly, this provision dispenses with the requirement of a jury trial and requires that the finding be made by the trial court, with or without the aid of an appointed appraiser.

Furthermore, the law of Ohio has, for some time, been that the constitutional provision for a right to jury trial applies only where trial by jury existed at common law. As early as 1799, the territorial legislature established special proceedings to ascertain value to be paid where otherwise a money damages action would lie. See *Willyard* v. *Hamilton* (1836), 7 Ohio 398. In *Willyard,* the precise argument as presented in the case *sub judice* was set forth as an objection to the statutory grant of power to a board of commissioners to determine valuation. In commenting on the applicability of Ohio's constitutional protections for a right to jury trial, the court made the following observations:

"* * * Perhaps there is no constitutional question which has ever been discussed in this country, which has been so completely settled by contemporaneous construction and universal acquiescence. On what principle is it that juries are dispensed with in the greater number of our courts, in courts of equity, courts of admiralty, courts martial, and courts of justices of the peace. Magna charta declares that no man shall be deprived of life, liberty, or property, but by the judgment of his peers, *or* the law of the land. * * * [A]s juries were unknown in those courts before the great charter, their disuse constituted a part of the law of the land; and, therefore, although that charter was the first great instrument

which solemnly guaranteed jury trial to Englishmen, yet it has never been supposed that that institution constituted a part of the machinery of those courts. * * *

"The provision in magna charta, which I have referred to, is transcribed into the ordinance, omitting only the word *life*. And if the last six articles of this instrument are of perpetual obligation, then we have in Ohio the same law and the same course of proceeding as in England, and very nearly the same as in the other states of the Union. If the law were otherwise, no courts would have time sufficient to try the infinite multitude of actions which would arise. * * *" (Emphasis *sic*.) *Id.* at 402-403.

In a subsequent case, *Belding* v. *State, ex rel. Heifner* (1929), 121 Ohio St. 393, 169 N.E. 301, Ohio's General Assembly had provided that, in parentage determinations, the trial court was to determine the amount payable as child support, maintenance, etc. G.C. 12123, as amended April 30, 1923. In considering whether the statute violated the Ohio Constitution, this court stated that:

"It was not, however, the intention of the framers of that clause * * * to guarantee the right of trial by jury in all controversies. That guaranty only preserves the right of trial by jury in cases where under the principles of the common law it existed previously to the adoption of the Constitution. The right of trial by jury has uniformly been recognized and enforced in this state in actions for money, where the claim is an ordinary debt, but it is equally well recognized that many special proceedings for the enforcement of a moral duty, where the payment of money is the ultimate relief granted, does [sic] not entitle the parties to a jury trial. * * *" *Id.* at 396-397, 169 N.E. at 302.

It becomes clear that the special proceeding established by R.C. 1701.85, providing for valuation of shares by the trial court, need not require the participation of a jury. Obviously such valuations are most similar to those kinds of proceedings which were exempt at common law. Accordingly, we find that the General Assembly did not violate the Ohio Constitution by its creation of the valuation proceeding under R.C. 1701.85.

## V

R.C. 1701.85(B) provides that following a determination of fair cash value of the dissenters' stock, the trial court "shall render judgment against the corporation for the payment of it, with interest at such rate and from such date as the court considers equitable." At trial, the court applied an interest rate of eight percent based upon R.C. 1343.01(A), which the court asserted, was "[t]he maximum rate of interest in Ohio." Despite the fact that such evidence was so offered, it was that court's view that it need not consider evidence of other possible rates of interest.

The court of appeals reversed the decision of the trial court. It held that the trial court "applied a statutory rate which is neither applicable nor controlling." Insofar as R.C. 1701.85 sets forth a "special proceeding" within the meaning of R.C. 2505.02, and one which provides for an interest rate based upon all equitable considerations, we are constrained to agree with the court of appeals that the statutory rate was not controlling. The trial court therefore should have considered other evidence as presented by the parties, including, but not limited to, the prevailing rate of interest for various kinds of loans, the average prime rate over that period of time and any other such evidence. The

sole statutory constraint is found in R.C. 1343.01 *et seq.* which prohibits a usurious rate of interest.

We do not, however, consider the statutory allowance of interest, upon whatever fair cash value is determined, to provide for an additional hearing. It is sufficient that the parties submit written briefs upon this issue and their evidence. Upon such basis, the trial court may, within its own discretion, determine an interest rate "which the court considers equitable." There is, of course, no question that such an award is interest upon the value of the shares and, despite tax considerations, not a damages award.

## VI

Finally, Dorothy Harrell appeals the decision of the courts below which refused to allow her to join numerous other causes of action into the R.C. 1701.85 proceeding. Supporting her on this issue are *amici curiae,* Charles Nickels et al.

These causes of action arise out of the actions of the Marathon board of directors in structuring and consummating the tender offer-merger transaction before us. The essence of these claims, primarily equitable in nature, is that the board of directors and controlling shareholders of their company breached their fiduciary duties in connection with the initiation, timing, negotiation, structure, approval, etc., of that merger. Consequently, plaintiffs and *amici* would require an inquiry into the entire fairness of the transaction and, presumably, allow whatever inquiry is necessary on the issue of the value of the corporation in light of the price offered to the dissenting shareholders for their stock, citing *Weinberger* v. *UOP, Inc.* (Del. 1983), 457 A. 2d 701, and *Rabkin* v. *Philip A. Hunt Chemical Corp.* (Del. 1985), 498 A. 2d 1099. See, also, *Singer* v. *Magnavox Co.* (Del. 1977), 380 A. 2d 969; *Tanzer* v. *International General Industries, Inc.* (Del. 1977), 379 A. 2d 1121.

Although not dwelt upon in the briefs, *Rabkin, supra,* and *Singer supra,* allow the maintenance of an alternative cause of action in addition to the Delaware statutory proceeding for the appraisal of dissenting shareholders' stock. Del. Code Ann. Title 8, Section 262 (1975). The Delaware statute, of course, relied specifically upon the stock market price as representing the value of the stock. *Id.* at Section 262(k), deleted by amendment (1983). By allowing the additional cause of action outside the statutory guidelines, the courts of Delaware permitted analysis of the amount offered to minority shareholders under theories of breach of fiduciary duties, lack of proper business purpose in cashing out the minority shareholders, gross inadequacy of price, misrepresentations in the proxy statement, failure to consider the "full value" of the shares, and that by breach of these fiduciary duties, the corporation failed to pay the full, fair value of the shares held. Obviously, such causes of action, centering as they do around the issue of whether the transactions provided "entire fairness" to the dissenters, permit a full inquiry into the intrinsic value of the dissenters' stock utilizing "*any techniques* or methods which are generally considered acceptable in the financial community and otherwise admissible in court." (Emphasis added.) *Weinberger, supra,* at 713.[21]

The issue accordingly narrows to whether the statutory proceeding under R.C. 1701.85 is the exclusive means for the determination of the price that shall be paid for those shares

___

[21] See fns. 5-10, *supra,* and accompanying text.

held by the dissenting shareholders. For those reasons which follow, we must hold that the statutory proceeding alone should be used to determine such value.

As demonstrated in Part I, *supra,* the legislature has evidenced a specific intent to narrow price considerations to those pertinent to the willing buyer-willing seller standard. R.C. 1701.85 (C). This invariably refers to the market price of the stock and, where sufficiently traded, the stock market price. Moreover, we have indicated the preferability of the stock market price as representative of the value of the dissenters' shares. The causes of action contended for go well beyond the stock market standard.

Therefore, the statutory proceeding under R.C. 1701.85 is the sole means for determining the value of a dissenter's shares in the present case. However, this is not to say that causes of action which seek compensation other than the value of a dissenter's shares of stock are not maintainable. Provable injury under whatever theory utilized is compensable so long as it does not seek to overturn or modify the fair cash value determined. Such theory may not, however, be joined to the R.C. 1701.85 proceeding, but is a separate cause of action subject to the applicable statute of limitations and *res judicata.* See *Radol* v. *Thomas* (C.A. 6, 1985), 772 F. 2d 244, certiorari denied (1986), 477 U.S. ___, 91 L. Ed. 2d 562, wherein a considerable number of Harrell's claims were considered and rejected.

The cause is accordingly remanded to the trial court for proceedings not inconsistent with this opinion.

*Judgment affirmed in part, reversed in part and cause remanded.*

MOYER, C.J., PATTON, LOCHER and WRIGHT, JJ., concur.

DOUGLAS and H. BROWN, JJ., separately concur in part and dissent in part.

PATTON, J., of the Eighth Appellate District, sitting for SWEENEY, J.

DOUGLAS, J., concurring in part and dissenting in part. I concur in the judgment of the majority as to the determination of fair cash value. I only write separately to indicate my disagreement with the analysis of the majority on some of the issues such as the questions involving the Price Trust and the Armstrong authority. It is my judgment that the trial court did a remarkable job under difficult circumstances. Judge Walker's disposition of the case should be reinstated in its entirety except for the determination of the fair cash value. It is understandable why Judge Walker would use the method he used to determine fair cash value rather than following the strict dictates of R.C. 1701.85(C). However, I read R.C. 1701.85(C) to be mandatory and therein lies my only disagreement with the trial court's judgment. Whichever method is used, that adopted by the trial judge or the procedure outlined in R.C. 1701.85(C), will make very little difference in the ultimate fair cash value determination.

Accordingly, I would reverse the court of appeals and remand the cause to the trial court for the sole determination of fair cash value using the formula set out in R.C. 1701.85(C). I would reinstate the remainder of the judgment of the trial court in all respects.

HERBERT R. BROWN, J., concurring in part and dissenting in part. I

agree with the well-reasoned opinion authored by Justice Holmes, except in one respect.

I cannot agree that the trial judge abused his discretion in not granting a continuance of the trial date, as requested by the Price Trust. In complex, multi-party litigation such as the case *sub judice,* deference must be given to the problems a trial judge faces in bringing the issues to trial.

Here, there are three reasons to uphold the trial judge's ruling denying the continuance: First, Price Trust has raised no substantive issue that was not presented by the other dissenting shareholders. Second, Price Trust had available to it the voluminous discovery conducted by the other dissenting shareholders. Finally, given the disposition which we make on the valuation issues, it is difficult to see what remains to be discovered. The majority opinion states: *"[T]he issues,* pursuant to our determination of the first (valuation) issue above, have been considerably narrowed, and *are resolvable without recourse to a further evidentiary hearing."* (Emphasis added.) Having found that there is no need for an evidentiary hearing, the majority opinion, in the next sentence, makes the astonishing pronouncement: "Nevertheless, Price Trust may, if it so chooses, engage in a limited discovery upon those issues yet to be determined *and may present any new evidence upon such issues as has not already been placed within the record."* (Emphasis added.)

I think, in charging the trial judge with abuse of discretion, we demonstrate a lack of sensitivity to the realities of this case.